ELIZABETH VARTANIAN, administratrix, *vs.* MARCUS W.
BERMAN
(and two companion cases[1]).

Suffolk.   December 2, 1941. — March 31, 1942.

Present: FIELD, C.J., DONAHUE, DOLAN, & COX, JJ.

*Negligence*, Surgeon, Anaesthetist.   *Physician and Surgeon.*

A finding of negligence of an operating surgeon, his assistant and an
anaesthetist, who, using ether, performed an operation during which
the patient died, was not warranted by testimony of the medical
examiner that certain conditions of the lungs, heart and kidneys,
with "the ether and the operation," were the important factors in
the death, where he did not testify that such conditions could have
been discovered by practical preoperative examinations.

Evidence that a patient who died during a surgical operation performed
with ether had a cold the day before the operation and that it would
be improper to administer ether to one suffering from a cold did not
warrant a finding of negligence of the operating surgeon, his assistant
and the anaesthetist in proceeding with such operation where there
was no medical evidence that the patient's cold would or did in fact
continue to the time of the operation.

THREE ACTIONS OF TORT.   Writs in the Superior Court
dated November 7 and 8, 1939.

The actions were tried before *Walsh*, J.

*R. B. Owen*, (*C. F. Nayor* with him,) for the plaintiff.

*C. J. Dunn*, for the defendants Berman and another.

*E. L. Twomey*, (*T. Chase* with him,) for the defendant
Kavalgian.

DOLAN, J.   These are three actions of tort in which the
plaintiff, as administratrix of the estate of Kazar Vartanian,
seeks to recover for the alleged negligence of the defend-
ants, three physicians, in connection with a surgical opera-
tion performed upon the intestate in the course of which he
died.   The cases were tried together and at the close of the
evidence the judge allowed a motion of the defendant in

---

[1] The two companion cases were by the same plaintiff against Aram
Kavalgian and Benjamin Parvey, respectively.

each case for a directed verdict in his favor, subject to the plaintiff's exceptions.

The evidence most favorable to the plaintiff would have warranted the jury in finding the following facts: For some months prior to January 3, 1939, the day on which the operation was performed, the defendant Kavalgian, a physician engaged in general practice, had been treating the intestate for a disease which he diagnosed as a chronic inflammation of the gall bladder. An x-ray taken at the City Hospital confirmed this diagnosis, describing the condition as "cholecystitis . . . . Pathological gall bladder." The intestate went to the McLeod Hospital on Monday, January 2, 1939. Dr. Kavalgian had last seen him prior thereto on Wednesday or Thursday of the preceding week. On January 2, he saw him at the McLeod Hospital and examined his heart and lungs and made an urinalysis. He found nothing wrong except the "gall bladder symptoms." He did not discover any nephritis as a result of the urinalysis then or before, though he had previously made three or four analyses of the intestate's urine. A nephritic condition would not always be disclosed by urinalysis. While he could detect a cold if the intestate had a cold on January 2 when he examined him, he testified that he had no cold. He knew that if the intestate had a cold it would increase the load on his heart and lungs and would be "contra-indicative to operating . . . it would complicate to pneumonia . . . the etherization . . . would produce pneumonia if the patient had a cold . . . that . . . [he would be] more susceptible to shock in the sense that the direct load would be on the lungs first and indirectly the load would be on the heart."

Dr. Kavalgian recommended that an operation be performed to remove the intestate's gall bladder and that the defendant Dr. Parvey be the operating surgeon. Under usual practice in the medical profession the chief operating surgeon is responsible for decisions as to what is to be done in the course of the operation. He takes command and direction when the patient comes to the hospital, but where there is a question of anaesthesia he consults the anaes-

thetist who chooses the anaesthesia. Dr. Parvey, however, had examined the intestate the night before the operation, had his temperature taken by a nurse, talked with him as to his symptoms and complaints, examined his chest with a stethescope, "dilated and percussed to determine whether his lungs were in normal condition and his heart." Dr. Parvey testified that he would not have operated on the intestate if he had had a cold, but that he did not have a cold, and that even if the type of nephritis and of "organized" pleurisy of the lungs testified to by the medical examiner existed, it still would have been proper to administer ether to the intestate.

The defendant Dr. Berman was the anaesthetist. He testified that it would not be proper to anaesthetize a man with a bad cold for reasons already recited; that he took no steps to ascertain the condition of the intestate's kidneys outside of inquiring into it either from Dr. Parvey or Dr. Kavalgian; that a nephritic condition would increase the risk of administering ether to a certain extent, but that an "organized" pleurisy means a healed condition which would not indicate itself in a proper preoperative examination. He also testified that about twenty minutes before the operation he talked to and examined the intestate in the presence of the other defendants; that he asked him whether he had had a cold recently, examined his lungs, heart, blood pressure and pulse, and ascertained his temperature and that the urine examination had been made; that there was no indication that the intestate had a cold or was suffering from a pleurisy, or a heart or a lung condition; and that he was a good risk.

The plaintiff, the widow of the intestate, testified that "at the time the deceased went to the hospital for an operation on January 2 he had a little cold in his chest and was sneezing a lot and had heavy breathing; [and] . . . complained [to the plaintiff, his widow] of pain in his side and heavy breathing in his chest and he had a cold . . ." but that he had had a pain in his side for a year or two.

Dr. Parvey was the operating surgeon. Dr. Kavalgian was his first assistant at the operation. Dr. Berman was

the anaesthetist. He administered ether to the intestate by the cone method and stayed at his head during the operation. The intestate remained under ether until the operation was complete so far as the removal of the gall bladder was concerned "and also a partial sewing up of the wound." Suddenly it came to Dr. Berman's attention that "something was wrong. The patient stopped breathing . . . attempts were made to resuscitate him . . ." but failed.

The medical examiner certified as the cause of death "Syncope while under the influence of ether administered as a surgical anaesthetic for cholecystectomy — accidental."

The testimony of the medical examiner, who together with the three defendants had been called to testify by the plaintiff, may be summarized as follows: He performed an autopsy on the body of the intestate to determine the cause of his death. The intestate had had some heart condition before the operation, but his heart was better than average and was "good enough for what he had to do"; there were no gross defects; it was dilated due to a terminal condition at the time of death. The intestate had an organized pleurisy, a healed lung inflammation; an "arteriosclerotic nephritis," a kidney condition due to hardening of the arteries, an old organized meningitis, "proliferative aortitis" and "hypertrophic arthritis" of the spine. The cause of the intestate's death was the ether plus the surgical shock and the important factors in the death were "nephritis, the heart, the pleurisy, the ether and the operation." Those were "the important parts" of the man from the point of view of his death. The pleurisy might "theoretically" have been detected by the use of many x-rays, but not "practically"; the kidney condition could probably have been detected by prolonged examinations over a long period of time, but "it wasn't doing him any harm." The condition of the intestate's heart could not have been discovered before the operation. From a surgical viewpoint the operation was well done. The "man's whole condition caused the death when ether was added to it." The medical examiner "did not intend to give the opinion

that ether had been improperly administered or that there had been an overdose . . .'' He made no reference to a cold.

It is settled that the defendants' duty to the intestate was to use the care and skill of the ordinary practitioner in medicine or surgery in the community in which they practised, and that "It is only in exceptional cases that a jury instructed by common knowledge and experience may without the aid of expert medical opinion determine whether the conduct of a physician toward a patient is violative of the special duty which the law imposes as a consequence of this particular relationship." *Bouffard* v. *Canby*, 292 Mass. 305, 309. *Langis* v. *Danforth*, 308 Mass. 508, 511, and cases cited.

It seems clear that the evidence would not warrant the jury in finding that any of the defendants was negligent in taking part in the operation because of any condition of the intestate's heart, lungs or kidneys. This was a subject matter upon which the jury could not rely upon common knowledge and experience, but one upon which the aid of expert testimony was required to guide them. That testimony was not sufficient to show that the defendants did not in these respects exercise the care and skill of the ordinary practitioners in medicine or surgery in the community in which they practised.

The only questions remaining are whether the jury could find properly that the intestate did have a cold at the time of the operation and whether any or all of the defendants were negligent in failing to detect it. There was evidence tending to show that when the intestate went to the hospital on January 2 he did have a cold, that at some time on that day or night he was examined by Dr. Kavalgian and by Dr. Parvey, and that if the intestate did then have a cold it could have been detected; but there was also evidence tending to show that when examined he did not have a cold, and the plaintiff did not introduce any evidence to show that the cold that could have been found to have existed at the time the intestate entered the hospital would either necessarily or probably be present at the time of the

operation on the next day. The burden of proving the causal relation between the alleged negligence of the defendants and the death of the intestate rested upon the plaintiff. It could not be left to conjecture or speculative inferences. *Marangian* v. *Apelian*, 286 Mass. 429, 436.

In the present cases in the face of direct medical testimony that at the time of the operation upon the intestate he was not suffering from a cold; in the absence of any testimony by the medical examiner tending to show that any such condition was disclosed by the autopsy or was a contributing cause of the intestate's death; and in the absence of any testimony by any one learned in the medical profession to show that the cold, which it could have been found the intestate had on the day before the operation, would continue and exist on the following day, we think that it cannot be said rightly that the jury, guided only by common knowledge and experience, could find that the intestate did have a cold when operated upon and that the defendants were guilty of negligence in proceeding with the operation.