THOMAS J. KILEY, JUNIOR, *vs.* ALICE M. DERVIN, administratrix.

Middlesex. May 4, 1943. — August 4, 1943.

Present: FIELD, C.J., DONAHUE, QUA, DOLAN, & COX, JJ.

*Negligence*, Physician. *Physician and Surgeon.*

Evidence did not warrant a finding of negligence of a physician, not shown to have engaged in anything other than general practice, in caring for a fractured and dislocated elbow of his patient, even if a "drop in the arm of ten . . . per cent" was detrimental to the patient and was due to the fact that an X-ray technician, in taking X-rays ordered by the physician, removed a splint and bandages from the patient's elbow with the physician's permission, and in removing them did not administer an anesthetic.

TORT, originally against Lawrence J. Dervin. Writ in the Superior Court dated April 18, 1933.

The action was tried before *Brown*, J. Following the recording of a verdict for the plaintiff subject to leave reserved, a verdict for the defendant was ordered entered. Thereafter the defendant died and the administratrix of his estate appeared to defend. Both parties alleged exceptions.

*R. L. Mapplebeck*, for the plaintiff.

*J. N. Clark*, for the defendant.

Cox, J. The consolidated bill of exceptions states that this is an action of tort to recover for injuries arising out of the alleged "negligent attendance and malpractice" on the part of the defendant's intestate, a physician, hereinafter referred to as the defendant. The plaintiff's exception is to the entry of a verdict for the defendant under leave reserved, and the defendant's exceptions are to the refusal of the trial judge to grant certain requests for rulings which are pressed in the event that the plaintiff's exception is sustained.

The jury could have found the following facts: The plaintiff, a boy of about five years of age, sustained a fracture and dislocation of his elbow on Friday, July 26, 1929. His injuries were disclosed by an X-ray that was taken at the

Central Hospital in Somerville. The fracture and disloca-
tion were "adjusted" at the hospital, and a splint and proper
bandages were applied. Word was sent to the defendant's
office that the physician who had treated the plaintiff was
referring the case to him. Later in the day, and again in
the evening, the plaintiff's mother talked "on the telephone"
with the defendant. What was said does not appear. The
defendant came to see the plaintiff at about two o'clock the
following day, and at that time he released the bandages
and stated that "he would take care of the arm straight-
forward." At that time the plaintiff was crying continu-
ally from pain, and the defendant's instructions were to
have some X-rays taken. The plaintiff was later taken to
the hospital where more X-rays were taken. Just when
this was done does not appear, although the judge stated to
the jury that the report of the X-ray was dated July 31.
The defendant "had to be called" after the X-rays were
taken before he came to see the plaintiff. Just when this
was does not appear, but the following day the plaintiff's
mother called the defendant three times "to try to get him
to come down and see the boy," and his answer was that he
would not, that he was going to the hospital to see the X-
rays there, and would give her no information until he saw
them. She called him again the following day and when he
came he told her that "We have got to have more X-rays."
The plaintiff's mother decided to take the boy to an X-ray
laboratory, and at that time the defendant called the tech-
nician there and told him that in order to get a clear picture
he might remove the splint and whatever bandaging there
was on the arm. The following day the plaintiff's mother
took him to the laboratory where the technician, in taking
the pictures, removed the bandages and splint and, after
the pictures were taken, replaced them. The boy was taken
directly from the laboratory to the defendant's office, where
the defendant was told that the bandages and splint had
been removed. He looked at the arm and said: "The
splints are all right," but he would give the plaintiff's mother
no information as to what the boy's condition was, telling
her to come to his office "Monday night." It would seem

from a question that was asked and from one of the defendant's requests for a ruling that the pictures were taken at the laboratory on August 3. The plaintiff's father and mother went to the defendant's office on the Monday night, as requested, and were told by the defendant that the arm "was beyond him," and he advised that the plaintiff be taken to the Massachusetts General Hospital. "Later," after a talk between the defendant and the plaintiff's mother, the plaintiff was taken to the Children's Hospital where an operation was performed and an "open reduction done" on his arm.

The physician who had treated the plaintiff at the Somerville hospital examined the pictures that were taken at the laboratory and testified that they showed that "something had happened to the arm, a drop in the arm of ten (10%) per cent, and in his opinion [this] was due to the fact that the splints and bandages were allowed to be taken off, and he felt that it was an error to allow the splint and bandage to be taken off without giving the plaintiff some anesthesia [sic], and regardless of who was responsible for this error it was an error to do it without giving a boy of five years old some anesthesia [sic]."

The defendant, who was a witness, testified that he could not remember whether or not he had ever inquired at the hospital concerning the taking of any X-ray after the reduction of the fracture; that when he first saw the plaintiff's arm it looked as if the fracture had been reduced; that he had no recollection of looking at the hospital records; that it would have been a good thing to have done so, and that not to have done so would have been "the wrong thing." He did not consult with the physician who treated the plaintiff at the hospital in Somerville.

We are of opinion that this evidence did not warrant the submission of the case to the jury and that a verdict was rightly entered for the defendant.

For all that appears in the record, the treatment at the Somerville hospital was proper. The plaintiff concedes that it could have been found that the fracture and dislocation were properly adjusted there. In this connection, however,

it is to be noted that it does not appear that any X-ray was taken immediately after the treatment. It does not appear that the defendant engaged in anything except general practice, in the course of which he had seen a number of fractures. See *Borysewicz* v. *Dineen*, 302 Mass. 461, 463–464; *Vartanian* v. *Berman*, 311 Mass. 249, 253. Having in mind the evidence that the fracture had been adjusted and a splint and proper bandages applied, in the absence of any X-ray immediately thereafter it could not have been found that the defendant was remiss in not seeing the plaintiff until the following day. There is no suggestion that his act in releasing the bandages on the occasion of that visit was anything but proper. At that time he gave instructions to have some X-rays taken. See *Shannon* v. *Ramsey*, 288 Mass. 543, 551–552. As already pointed out, it does not appear when the X-rays were taken. All we have is that the defendant received a report that was dated July 31. The fact that the X-rays were taken at the hospital where the defendant was a member of the staff, nothing more appearing, is of no consequence when we have in mind the circumstances in which these later X-rays were taken. For all that appears, the X-rays required technical interpretation and a report. In any event, the defendant's conclusion was that more X-rays had to be taken. Without objection the judge stated to the jury that the report of the second pictures was "unsatisfactory." It is to be borne in mind that up to this time, so far as the record discloses, there was nothing about the initial treatment of the plaintiff to indicate that it was not entirely proper. Whether the defendant knew that an X-ray had not been taken after the treatment, if it had not, does not appear. But in any event, it would seem that it was a wise precaution for him to have more pictures taken. Accordingly, for all that appears up to the time when the defendant told the plaintiff's mother that they would have to have more X-rays, the record discloses nothing from which the jury could find that the defendant had been negligent. It was not until the pictures were taken at the laboratory that it appeared that something had happened to the arm.

It does not appear what the defendant could have learned from the physician who first treated the plaintiff, nor what the X-ray that had been taken would show nor what the hospital records would disclose. In the state of the record there was nothing to justify the jury in finding that any failure on the part of the defendant to visit the plaintiff, or to avail himself of what the first X-ray and the hospital records might disclose or of what the hospital physician might know about the case, caused proximately any damage to the plaintiff. *Vartanian* v. *Berman*, 311 Mass. 249, 254.

The testimony of the attending physician at the hospital, already referred to, does not help the plaintiff. When he examined the films that were taken at the laboratory, "they showed that something had happened to the arm, a drop in the arm of ten . . . per cent, and in his opinion [this] was due to the fact that the splints and bandages were allowed to be taken off, and he felt that it was an error to allow the splint and bandage to be taken off without giving the plaintiff some anesthesia [*sic*], and regardless of who was responsible for this error it was an error to do it without giving a boy of five years old some anesthesia [*sic*]." We assume, without deciding, that the jury could have determined what part, if any, of this testimony it would accept. See *Lydon* v. *Boston Elevated Railway*, 309 Mass. 205, 206–207, and cases cited. Compare *Carlen* v. *Gaw*, 292 Mass. 398, 399. Under this assumption, it could have been found that the "drop in the arm" was due to the fact that the splint and bandages "were allowed to be taken off," without reference to anesthesia.

Nowhere in the record is there anything to indicate the significance of a "drop in the arm" of ten per cent, but the parties appear to have assumed that it was a detriment to the plaintiff. It does appear from the record of the Children's Hospital that after the open reduction was performed by opening up the arm and removing the fibrous tissue separating the fragments and suturing the fragments "the small fragment slipped and a closed manipulation was done, and the bone apparently put back in good position." It could have been found that the plaintiff had "120 degree perma-

nent flexion deformity." In the absence of any help from the record, we make no attempt to interpret these various technical medical terms. See *Smardon* v. *Metropolitan Life Ins. Co.* 243 Mass. 599, 602.

There is, however, nothing to show that it was bad practice to remove the splint and bandages in order to take an X-ray. So far as appears it may have been the proper, if not the necessary thing to do, although the result might be bad. There is nothing to indicate that the removal was not done properly. The second X-ray that was taken at the hospital was "unsatisfactory." For all that appears, sound professional judgment might well have warranted, if not required, the removal of the splint and bandages in order that a satisfactory representation of the plaintiff's arm could be obtained. The precise question is whether there was a breach of the defendant's duty in directing the removal. There is no evidence that there was. *Mallen* v. *Boynton,* 132 Mass. 443, 446. *Bouffard* v. *Canby,* 292 Mass. 305, 309–310. *Tallon* v. *Spellman,* 302 Mass. 179, 183–184.

Still assuming that the jury could have accepted such part of the hospital physician's testimony as they deemed credible, it could have been found that it was an "error" to allow the removal of the splint and bandages without giving the plaintiff some anesthetic. There is no direct evidence that an anesthetic was not administered. From the testimony of the hospital physician it seems that he assumed that it was not. But whether it was or not, the question is whether the defendant was negligent in what he did.

There is no evidence that the defendant knew that an anesthetic would not be administered if the conditions required it. There is no evidence that the X-ray technician at the laboratory was not a suitable person to entrust with the removal of a splint and bandages in order that a satisfactory X-ray might be obtained, nor is there any evidence that if the technician was not a suitable person, the defendant had any reason to know that he was not. For all that appears, the technician may have been a member of the medical profession. The removal of the splint and bandages,

in the circumstances, and any probable results therefrom, are matters peculiarly within the knowledge of physicians, calling for opinions from them, and not within the general knowledge of laymen. *Borysewicz* v. *Dineen*, 302 Mass. 461, 463–464, and cases cited. *Vartanian* v. *Berman*, 311 Mass. 249, 253, and cases cited.

Moreover, if it be assumed that no anesthetic was administered, it is a matter of conjecture whether this resulted in the "drop in the arm." It does not appear that the plaintiff did anything while the laboratory X-ray was being taken which in any way disturbed the position of his arm. For all that appears, the "drop" may have come from entirely different causes than the lack of an anesthetic. It is true that the evidence discloses that when the plaintiff was taken to the Somerville hospital, X-rays revealed a fracture and dislocation of his elbow, and that "This was adjusted . . . and a splint and proper bandages put on." As far as appears, no X-ray was taken to verify this adjustment. Several days elapsed before the laboratory X-ray was taken. Upon this record, it cannot be said that the hospital physician's testimony relative to the lack of an anesthetic presented a jury-question. We have in mind that this physician testified that "Something had happened to that arm . . ." and that when he was asked if, in his opinion, that was due to the fact that the splint and bandages "were allowed to be taken off," he replied, "It is hard to say, not knowing what was done" but that "It might be one of the causes." See *Halnan* v. *New England Telephone & Telegraph Co.* 296 Mass. 219, 223.

In the circumstances, the defendant's exceptions need not be considered. They are treated as waived. The plaintiff's exception is overruled.

*So ordered.*