HAROLD E. STEWART & another *vs.* WORCESTER GAS LIGHT
COMPANY
(and two companion cases).

Worcester.   September 27, 1960. — November 16, 1960.

Present: WILKINS, C.J., SPALDING, WILLIAMS, WHITTEMORE, &
CUTTER, JJ.

*Negligence,* Contractor, In excavating, Gas, Service pipe. *Proximate Cause. Nuisance. Gas. Evidence,* Matter of conjecture; Opinion: expert. *Agency,* Scope of authority or employment. *Practice, Civil,* Charge to jury; Exceptions: whether error harmful. *Error,* Whether error harmful.

Evidence warranted a finding of negligence on the part of a contractor who, while digging in the lawn of a house with a power hoe, "snagged"

the gas service pipe leading to the house and tore the pipe apart at a coupling, whereby gas which later exploded escaped from the pipe into the house.  [431]

Negligence on the part of a contractor in tearing apart the gas service pipe leading to a house while digging with a power hoe in the lawn of the house and thereby allowing gas to escape from the pipe into the house might properly be found to have been the proximate cause of a later explosion of the gas in the house even if negligence of the gas company after the breaking of the pipe contributed to the explosion. [431]

A gas company which, upon discontinuance of service to a house, closed the shutoff on the service pipe in the cellar of the house and removed the meter but did not close the shutoff on the pipe at the street, whereby the pipe was left filled with gas which, some years later, escaped from a break in the pipe into the house and exploded there, was not liable to the owner of the house on the ground of maintaining a "nuisance" irrespective of negligence or other fault on its part.   [431–432]

Evidence, that upon discontinuance of gas service to a house the gas company closed the shutoff on the gas service pipe in the cellar and removed the meter but did not close the shutoff on the pipe at the street, whereby the pipe was left filled with gas, and that seven years later the pipe was torn apart by a contractor digging in the lawn of the house with a power hoe and gas escaped from the broken pipe into the house and there exploded, warranted a finding of negligence on the part of the gas company toward the owner of the house without expert testimony respecting proper practice upon discontinuance of a service. [432–434]

Evidence of the circumstances in which, after the gas service pipe to a house had been torn apart by a contractor digging in the lawn with a power hoe and the presence of gas from the broken pipe in the cellar of the house had been observed, the gas company upon telephone notification of trouble at the house sent there a draftsman with plans of the gas system and also a repair crew, who were in process of locating and closing the street shutoff when the gas in the cellar exploded from sparking of an electric switch, did not warrant a finding of negligence on the part of the company toward the owner of the house with respect to the company's conduct after the notification.   [434]

The propriety of the location close to a house of a "dresser coupling" in a gas service pipe, by which two sections of the pipe were joined by a sleeve rather than threaded joints, was a technical matter not to be determined by a jury without the aid of expert testimony.   [435]

In an action against a gas company by the owner of a house for damage to it occurring when gas leaked into the cellar from a break in the gas service pipe caused by a third person and exploded from sparking of an electric switch, evidence respecting a draftsman whom the company, besides a repair crew, sent with gas system plans to the house upon the company's being notified of the leak did not warrant a finding that the draftsman had any duty or authority beyond locating the gas facilities, and there was error prejudicial to the company in the admis-

sion of evidence as to his failure to take certain precautions to prevent the explosion and evidence of a statement by him that further ventilation of the house "wasn't necessary," followed by a charge to the jury in which the judge said nothing to cure the error.   [436–438]

THREE ACTIONS OF TORT.   Writs in the first two actions in the Superior Court dated August 23, 1957, and December 11, 1957; writ in the third action in the Central District Court of Worcester dated March 17, 1958.

Upon transfer of the third action to the Superior Court, the actions were tried together before *Tomasello, J.*

*Matthew R. McCann,* for Worcester Gas Light Company.

*Baron H. Crowell, (Arnold W. Olsson* with him,) for the plaintiffs Stewart.

*Fred L. Williams, & Sidney S. von Loesecke,* for the plaintiff McCabe, submitted a brief.

*Philip J. MacCarthy,* for the plaintiff Carenzo and the defendant Boylston Contractors, Inc., submitted briefs.

CUTTER, J.   These actions arise from a gas explosion on March 5, 1957, which destroyed Mr. and Mrs. Stewart's house in West Boylston and injured Mrs. McCabe and Anthony Carenzo, an employee of Boylston Contractors, Inc. (Boylston).   Boylston had made a contract with Stewart to dig a leaching pit on Stewart's front lawn.   During the work a power hoe tore apart a gas company service line about two feet below the surface of the lawn.   Gas escaped into the house and later exploded there, while Carenzo was digging a trench in the lawn and Mrs. McCabe was sitting in an automobile in a driveway abutting the Stewart premises.

The actions[1] were tried together.   There were verdicts for Mrs. McCabe against Boylston and against the gas company, and for the Stewarts and for Carenzo against the gas company.   The cases are here on Boylston's exception to the trial judge's refusal to direct a verdict for it and upon the gas company's exceptions to the refusal to direct a ver-

---

[1] One by Mr. and Mrs. Stewart against the gas company; one by Mrs. McCabe against the gas company and against Boylston; and one by Carenzo against the gas company and also against Stewart, for whom a verdict was directed.

dict for it on each count against it and to rulings on evidence. We consider the evidence in its aspect most favorable to the plaintiffs.

The gas company's offices were in Worcester. It served customers in that city and in surrounding towns. From a street gas main a one inch service line ran under the Stewarts' lawn and along, and about two and a half feet from, the house foundation to midway along the side of the house. There, after a right angle turn, it entered the foundation wall. In this one inch line, about eleven feet from the street main, there was a curb cock shutoff in a box, not visible from above, about an inch below the surface of the public way. Between this box and the house were forty-two feet of one inch pipe, then a so called dresser coupling (about two or three feet from the house), then about ten feet of pipe which ran to the right angle bend. Inside the house, on the service line, there were a wing cock shutoff and a meter cock shutoff.

In 1950, Stewart decided to discontinue service and told the gas company to shut off the gas, or take out the meter. The company closed the wing cock and meter cock inside the cellar and removed the meter. It did not remove the service line. The curb cock was left open so that gas ran as far as the inside wing cock. Stewart did not request removal of the pipe or of the gas from the pipe.[2]

Before Boylston started to dig the leaching pit, Stewart pointed out to Kimball, Boylston's administrative officer, the location of the water line and told him that "the gas pipe was under his lawn." Stewart did not know the location of the gas line or whether it had gas in it. Kimball did not tell the foreman or members of Boylston's crew about either line. The foreman did not know that the gas line was there and did not inquire. The gas company was not notified of the proposed work nor was it requested to furnish plans of the gas lines.

---

[2] In 1956, Stewart signed a sale agreement for a gas heater to assist a relative, a gas company salesman, in a sales contest. This was promptly cancelled and no request to resume gas service was made.

On March 5, 1957, shortly after 8 A.M., Boylston's crew arrived to do the work. The Stewarts were not there. Kimball staked out the leaching pit and left the crew in charge of a foreman, Turini. About 9 A.M. the power hoe "snagged the gas service line . . . , the operator thought it was a root and . . . bent it about nineteen . . . inches out of line, but did not break it at the point of contact." The line came "apart at the . . . dresser coupling[3] allowing gas to escape underground."

Two electric services ran to the house. One supplied current to the hot water heater. On the inside cellar wall there were two plainly visible main switches and there was evidence "that a spark was apt to occur upon the throwing of a switch." It could have been found that gas escaping underground through the frozen ground reached the cellar and that sparking of a thermostat switch in the water heater caused the explosion.

Shortly after the service line was broken, "Turini had a woman across the street call the gas company," but did not talk by telephone himself. This call, received about 9:10 A.M., came to the attention of Lutz, superintendent of the distribution department. The telephone message appears to have been that "a gas pipe had been hit in the street," or "that there was a leak in the gas in front of the Stewart house."

Lutz at once dispatched to the Stewart house one Fleming, a draftsman, with plans of the underground gas systems in West Boylston. Fleming left the Worcester office about 9:20 A.M.[4] in a company passenger automobile and arrived at the Stewart house, about eight miles away, about

---

[3] A dresser coupling is a fitting designed to join two pipes without threading. It is intended to absorb any displacement or lateral play of underground pipes. It may be safer than a threaded union. It has a sleeve at each end which fits over the ends of the pipes to be connected. The fitting can be made tight. This coupling had a rated capacity for containing gas under pressure of 1,500 pounds per square inch. This gas service had a pressure of about thirty-six pounds per square inch.

[4] Other somewhat confusing testimony would place the break in the pipe a little earlier than 9 A.M., possibly about 8:30 A.M. to 8:40 A.M., and the arrival of Fleming earlier than 9:40 A.M. All the testimony was that Fleming arrived before the repair crew.

9:40 A.M. Lutz also made prompt efforts to get in touch with one or more of his ten or twelve crews operating from five repair trucks, first by radio and then by telephone. At about 9:15 A.M. he reached Kalinowski, the foreman in charge of a repair crew then in Millbury. Kalinowski and his crew went at once about ten or twelve miles to the Stewart house, and arrived there about 9:44 A.M. The West Boylston fire department received a fire alarm call at 9:50 A.M.

Fleming, whose experience is discussed more fully below, did not take with him a wrench to shut off the curb cock, although such a wrench was available near Lutz's office. Fleming's testimony was that his function was "merely to bring the plans." There were other men in the gas company's drafting department, when the telephone call came in, who "had experience in the handling of gas leaks." The gas company does not maintain an emergency crew at its distribution department headquarters.

Before initiating the telephone call to the gas company, Turini and another entered the Stewart cellar. They "could smell gas and hear it hissing. . . . They . . . opened all the windows" so far as not obstructed and obtained cross ventilation. "They also shut off two . . . switches on the furnace, but did not shut off the two main switches."

Later, Stewart arrived at his house. Turini, Stewart, and another man went into the cellar for a minute or two. Stewart "walked near" the main switches, "but did not touch them." Fleming soon arrived, "dressed in street clothing, not working clothes." After looking at the bent pipe, he went into the cellar with the others. "They told him they had shut off the switches to the furnace." There was a smell of the heavy gas concentration. He noticed that the service pipe at the wall had not been "pulled or moved," and saw that the "wing cock and the meter cock" were closed and not leaking. When they came out of the cellar, Stewart and Turini left the premises. Fleming started to find the curb shutoff box and was checking his

plans when Kalinowski and his crew arrived with tools. Fleming described the situation to Kalinowski. Within a "couple of minutes" of Kalinowski's arrival, they found the curb shutoff box by using the plan and closed the shutoff. At that moment the house blew up.

1. The judge properly denied Boylston's motion for a directed verdict in the action brought by Mrs. McCabe. Boylston could have been found negligent upon the evidence (a) that its hoe tore the service line apart; (b) that Kimball, although warned of the gas pipe, did not mention it to Turini; (c) that Turini did not ask whether there were gas pipes in the lawn; and (d) that the escape of gas caused by the break contributed directly to the explosion.

Boylston argues that intervening negligence on the part of the gas company relieved Boylston of liability. Boylston's negligence, however, could be found to be a concurrent, contributing cause of the explosion, even if it also could be found that, after the service pipe was broken, the gas company by some negligent act or omission helped to cause the explosion. See *Guinan* v. *Famous Players-Lasky Corp.* 267 Mass. 501, 516–517; *Flaherty* v. *New York, N. H. & H. R.R.* 337 Mass. 456, 462. See also *Carroll* v. *Cambridge Elec. Light Co.* 312 Mass. 89, 94–97; Prosser, Torts (2d ed.) § 49. Cf. *Demers* v. *Illinois Cent. R.R.* 339 Mass. 247, 250–251, and certain distinguishable railroad cases there cited. Cf. also *Clifford* v. *Atlantic Cotton Mills*, 146 Mass. 47, 48–49. Any conduct of the gas company on March 5, 1957, after the break in the service line, could be found to have been of a type foreseeable as likely to occur after such a break.

2. In the Stewarts' case against the gas company, a count in negligence and a count alleging maintenance of a nuisance were submitted to the jury. There was no basis for finding that the gas company was maintaining a nuisance by leaving its service pipe filled with gas. The pipe, until broken by Boylston, had not caused trouble. If service had been continued, it would not have constituted a private nuisance. The Stewarts had not been shown to

have asked that the service pipe be removed or that gas be shut off at the curb. To permit recovery based on nuisance without showing the gas company to be at fault would hold the gas company absolutely liable for any accident as, in effect, an insurer. The maintenance of gas in a company system in the public streets does not give rise to liability without fault. See *Musolino LoConte Co.* v. *Boston Consol. Gas Co.* 330 Mass. 161, 162–165. We think that, although the gas company's pipes were on private property rather than in a street, either an intentional injury or negligence must be shown to hold the gas company liable. The confusion in cases where negligence must be shown caused by references to "nuisance" as a ground of liability has recently been discussed in *Delano* v. *Mother's Super Mkt. Inc.* 340 Mass. 293, 295–297. That case expressly limited *United Elec. Light Co.* v. *Deliso Constr. Co. Inc.* 315 Mass. 313, in respect of nuisance, at least to its peculiar facts.

3. The plaintiffs contend that the gas company was negligent because in 1950 it did not turn off the gas at the curb cock. They argue that if the gas had been shut off at the curb, the accident would not have occurred and that it was foreseeable that interference with the service line would occur.

Some courts have taken the view that failure to shut off gas at the curb is not by itself evidence of negligence sufficient to present a jury question. See *Brady* v. *Consolidated Gas Co.* 85 Md. 637, 642; *Consolidated Gas Co.* v. *Getty,* 96 Md. 683, 688; *Reid* v. *Westchester Lighting Co.* 236 N. Y. 322, 325; *Canfield* v. *West Va. Cent. Gas Co.* 80 W. Va. 731, 735; *Weinke* v. *Philgas Co.* 224 Wis. 78, 80–81; *Shaw* v. *Wisconsin Power & Light Co.* 256 Wis. 176, 178 (three dissents; see annotation, 13 A. L. R. 2d 1396–1405). See also *Rader* v. *Nashville Gas Co.* 37 Tenn. App. 621, 623–624, 628; *Castner* v. *Tacoma Gas & Fuel Co.* 123 Wash. 236, 240–241, *S.C.* 126 Wash. 657. Other courts have taken in varying degrees a different view. A few cases seem to hold that failure to shut off a discontinued service at the curb cock is in itself sufficient evidence of negligence. See *Chis-*

*holm* v. *Atlantic Gas Light Co.* 57 Ga. 28, 31; *Lommer* v. *Scranton-Spring Brook Water Serv. Co.* 66 F. Supp. 878, 879 (M. D. Pa.) ; *United States* v. *Canale,* 163 F. Supp. 445, 447 (E. D. Pa. — jury could find company "liable if they determined that it was unreasonable to leave the gas within the service line" and if they also found causal connection with the injury). These two Federal court decisions, however, may be inconsistent with what was said in *Goodman & Theise, Inc.* v. *Scranton-Spring Brook Water Serv. Co.* 352 Pa. 488, 494, to the effect that although "failure . . . to cut . . . service . . . at the street may not in itself constitute negligence," there is a duty to exercise a high degree of care and to inspect the pipe and to keep it in repair. See also *Nephew* v. *Consumers Power Co.* 283 Mich. 12, 18 (evidence of failure to shut off gas at curb, although not itself negligence, may be considered as bearing upon company's due care).

There was no evidence here that the gas company had allowed the service pipe to deteriorate or to fall into disrepair. Even constant inspection of the service pipe by the gas company would not have prevented this accident. Nevertheless, the accident would not have happened if the gas had been turned off at the curb in 1950. This was done easily and quickly by the repair crew on the day of the explosion, and was obviously a simple operation. There was testimony that a gas line carrying a pressure of thirty pounds would be called a high pressure line and that 3,000 to 4,500 cubic feet would flow through a one inch line at this pressure in fifty minutes. The jury could have reasonably found that this presented a significant risk.

No Massachusetts case deals with precisely the question here presented, although some analogy is provided by *Sarna* v. *American Bosch Magneto Corp.* 290 Mass. 340, 342–343. We think that the jury reasonably could conclude that, upon a discontinuance of service sufficiently permanent (as opposed to a seasonal or temporary suspension) to involve removal of the gas meter, the gas company used less than reasonable care in dealing with a volatile com-

modity like gas, when it left gas in unused service pipes for seven years with no compensatory advantage to anyone to justify the continuing risk.

The jury, on the basis of their general knowledge of practical affairs, might reasonably infer that there was sufficient risk of deterioration or disturbance of the pipe and of its being forgotten or neglected by successive owners and others to make it reasonable and prudent for the gas company to shut off gas from the service pipe. A verdict could not properly have been directed for the gas company on the negligence counts.

Undoubtedly, it would have assisted the jury if there had been evidence of generally approved gas company practice as to service discontinuances. The question, however, was not so dependent on expert engineering knowledge that a jury could have no basis of decision without expert testimony. See e.g. *D'Entremont* v. *Boston Consol. Gas Co.* 320 Mass. 582, 584; *Lovely's Case,* 336 Mass. 512, 515–516.

Except for the circumstance that there must be a new trial on another ground, mentioned below, it would be unnecessary for us to consider whether it also could have been found that the gas company was negligent by reason of acts or omissions on March 5, 1957. We indicate briefly that examination of the present record reveals no evidence of failure by the gas company on March 5 to meet the standard of care imposed upon it. See *Holly* v. *Boston Gas Light Co.* 8 Gray, 123, 133–134. The somewhat vague, general telephone report to the gas company of the break in the service pipe showed no emergency which would require sending draftsmen to do a repair crew's job. We observe (see more complete discussion later in this opinion) no basis in Fleming's conduct for finding the gas company negligent because of his acts or omissions. Neither Lutz nor Kalinowski has been shown to have been guilty of delay or negligence. Of course, upon a new trial different or additional evidence may be offered.

We discuss also, because there must be a new trial, the dresser coupling. One Donohoe, an engineer with experi-

ence with gas systems, testified, subject to exception, that in his opinion a dresser coupling should be "put out at the street . . . where it is . . . available for inspection and where in cases of anything happening . . . [it] is not likely to cause . . . trouble within the . . . house." He also indicated that placing the coupling within two feet of the cellar wall, and not near the highway, would increase the risk. On cross-examination, however, Donohoe said with reference to this preference for a location near the street, "I didn't say it [apparently the actual location] was absolutely improper. I thought it was a better location." The bills of exceptions disclose no evidence about what is usual gas company practice in the use of dresser couplings, obviously a highly technical matter. Members of a jury, as part of their ordinary experience (see *Friese* v. *Boston Consol. Gas Co.* 324 Mass. 623, 628), would have no basis without expert testimony for determining whether this installation complied reasonably with proper standards of care. Donohoe's very general testimony, on cross-examination, that the actual location was not "absolutely improper" and that another was "better," was too inconclusive to afford a reasonable basis in such a technical matter for finding negligence in what was done. It left the jury to conjecture and surmise without adequately founded (see *Nass* v. *Duxbury,* 327 Mass. 396, 401–402; *Milch* v. *Boston Consol. Gas Co. ante,* 230, 233) essential, expert guidance. The question of the necessity of expert testimony, as a foundation for a finding of negligence, has most frequently arisen in cases involving medical knowledge, but the need of such special testimony may be equally great in other fields. See *Crowley's Case,* 287 Mass. 367, 375–376; *Tallon* v. *Spellman,* 302 Mass. 179, 183; *Murphy's Case,* 328 Mass. 301, 303. See also *Vartanian* v. *Berman,* 311 Mass. 249, 253; *Sevigny's Case,* 337 Mass. 747, 751–753; Harper and James, Torts, § 17.1, pp. 966–970. See also *Black* v. *Boston Consol. Gas Co.* 325 Mass. 505, 507–508; *Lovely's Case,* 336 Mass. 512, 515–516. Cf. *Zinnel* v. *United States Shipping Bd. Emergency Fleet Corp.* 10 F. 2d 47, 48–49 (2d Cir.).

4. The gas company saved several exceptions to the admission of evidence relating to Fleming's conduct and statements.

The evidence on the scope of Fleming's authority was meager. A service call slip noted that the call was referred by Lutz to Kalinowski and Fleming. Lutz did tell "Fleming to go to . . . [the Stewart house] with the plans . . . and meet Kalinowski." He went in a gas company automobile, dressed in street clothes, not working clothes. He made the inspection of the premises already described to "size up the situation" and he testified that "[d]epending on the way . . . [he] sized up the situation would be the steps that . . . [he] would take, or direct others to take, to correct the situation." When Kalinowski arrived, "Fleming immediately told Kalinowski the house was full of gas and that it should be shut off immediately." Fleming had worked for the gas company as a draftsman for seven years and had never done any manual work. All "of his work had been office work and engineering work on the outside," although he had some practical background in "piping, construction . . . and maintenance of gas installation[s] in that he had been sent out on jobs to observe what was being done, but . . . he had never done it himself, . . . he had never acted as a trouble shooter . . . but . . . he had studied texts." He testified (as already stated) that "he was sent . . . on the morning in question merely to bring the plans."

This evidence warranted no inference of authority or duty on the part of Fleming to do or to direct repair work. His statement that his inspection was to "size up" the situation was consistent with concern solely with carrying the plans to the Stewart house. He reasonably went to the cellar as a step in determining what gas lines and facilities needed to be found with the aid of his plans. His report to Kalinowski was appropriate to assist the latter in making use of the plans. Even if the jury did not believe that Fleming was sent only to convey the plans, such disbelief would not establish affirmatively a broader purpose

in sending him.   See *Zarrillo* v. *Stone,* 317 Mass. 510, 512;
*Cleary* v. *St. George,* 335 Mass. 245, 249.   Neither express
nor apparent authority (see *Thalin* v. *Friden Calculating
Mach. Co. Inc.* 338 Mass. 67, 70–71) to do more can be in-
ferred from the service slip or the use of a gas company
automobile.   The limited character of Fleming's assign-
ment, stated in his testimony, is supported by the narrow
character of his usual duties, the facts that he was not in
work clothes and arrived without tools, and the circum-
stance that Kalinowski promptly arrived to do the repairs.
See *Stone* v. *Commonwealth Coal Co.* 259 Mass. 360, 362,
363; *Cadogan* v. *Boston Consol. Gas Co.* 290 Mass. 496, 500–
501; Restatement 2d: Agency, § 229 (2) (a).   Cf. *Weiss* v.
*Republic Pipe & Supply Corp.* 335 Mass. 422, 425.

Testimony was admitted, subject to the gas company's
exception, (a) about why Fleming failed to take certain pre-
cautions, such as further venting of the cellar, cutting elec-
tric wires and the service line outside the cellar, and shut-
ting off the main switches, and (b) that, while Fleming was
in the cellar, Turini asked whether more windows should
be opened and was told by Fleming that this action "wasn't
necessary, that he had seen worse conditions."   The plain-
tiffs contend that this remark discouraged further ventila-
tion of the house.   This statement, and the evidence about
possible actions which Fleming did not take, should have
been excluded because there was no evidence that Fleming
was authorized to estimate the gas content of the cellar or
give advice about, or to participate in, reducing the hazards
caused by the leak, in any respect beyond locating the gas
lines and curb box.   See *Barrett* v. *Wood Realty Inc.* 334
Mass. 370, 373.   Cf. *Rosenston* v. *Bickford Shoes, Inc.* 340
Mass. 769, 772–773.   Cf. also *Barbeau* v. *Buzzards Bay Gas
Co.* 308 Mass. 245, 246, 248.

No exceptions to the charge are before us, but it appears
in the record.   The judge left it to the jury to consider
"whether, by the statement made by Fleming, the plaintiffs
were lulled into a sense of security for the . . . safety of
their persons or property," so that they did not appreciate

the real danger.  In effect, also, the jury, in determining whether the gas company was liable, were permitted by the charge to consider all of Fleming's conduct.  The judge in his charge thus did not cure any error in admitting (a) the alleged statement by Fleming and (b) evidence about Fleming's failure to act to prevent the explosion.  It was prejudicial error to admit testimony about the statements and conduct of Fleming not within the scope of any authority which it had been proved that he possessed.  There must be a new trial of the negligence counts against the gas company.

5.  Upon the consolidated bill of exceptions of the gas company, its exceptions in each case are sustained.  The exceptions of Boylston are overruled.

*So ordered.*