GEORGE S. WRIGHT, administrator, *vs.* NORTHAMPTON GAS
LIGHT COMPANY
(and two companion cases).

Hampshire.    September 30, 1960. — December 1, 1960.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, & CUTTER, JJ.

*Proximate Cause. Municipal Corporations,* By-laws and ordinances.
*Negligence,* Gas.

A verdict for the defendant was properly ordered in an action for the
death of a tenant of an apartment overcome by gas against the gas
company which supplied the apartment with natural gas where, al-
though a gas water heater not connected to a chimney by a vent pipe
was going in the apartment at the time of the accident, the defendant
had not sold or installed the heater and there was no evidence that the
defendant knew that it had been installed or installed without a vent
or had assumed any duty to the tenant with respect to it, and, even if
an employee of the defendant had turned on the gas to the apartment
at its meter outside nearly a month before the accident, no causal con-
nection between the turning on of the gas and the accident was shown.
[463–464]

A city ordinance that "No [gas] hot water . . . [heater] shall be re-
paired, relocated or installed and connected unless it is . . . properly
connected to the nearest chimney . . . by a pipe of suitable size" was

directed at the installation and connection of gas water heaters and had no application to a gas company's turning on the gas to a heater. [465]

THREE ACTIONS OF TORT. Writs in the Superior Court dated November 22, 1957.

The actions were tried together before *O'Brien, J.*

*Bruce G. Brown,* for the plaintiff.

*Robert H. Doran,* for the defendant.

CUTTER, J. These are three actions of tort for wrongful death and conscious suffering brought by the administrator of the estates of one Cleveland, his wife, and his infant son. The Clevelands were tenants of an apartment in Northampton served by the defendant (the gas company) with natural gas through a separate meter. All three were overcome by gas in their apartment on January 23, 1957. The plaintiff's exceptions are to the allowance of the gas company's motion for a directed verdict in each case. The facts are stated in their aspect most favorable to the plaintiff.

· The gas company has distributed natural gas in Northampton since December, 1951. At that time, after public advertising of the necessity for converting appliances for use with the new fuel, it ceased to supply manufactured gas. During the conversion period the gas company discovered that, in the apartment later occupied by the Clevelands, "there was no . . . vent pipe from the chimney . . . to the . . . gas . . . hot water heater." This fact was noted on a red card in the gas company files and a portion of the card was attached to the heater then in the apartment. The occupant of the apartment in 1951 was notified that there was an "unvented appliance." This heater was removed from the apartment on or prior to July 17, 1956, following a service complaint on July 16 by one Peterson, the then tenant. The landlady then "had a heater [owned by her] . . . stored in her basement transferred to the apartment . . . and connected by a licensed plumber." This heater also had no vent pipe connection with the chimney. A Northampton ordinance, enacted in 1953 (Rev. Ord. c. 31, § 23), provided, "No hot water tank shall be repaired, relocated

or installed and connected unless it is protected with safety devices as follows: . . . (f) . . . . Every water tank heater using . . . gas . . . shall be properly connected to the nearest chimney . . . by a pipe of suitable size.''

Peterson's service was disconnected on December 12, 1956. A gas company employee named Partridge went to the apartment building on December 26, 1956, ''for the purpose of turning the gas on at the meter for the Cleveland apartment . . . [and] found that the same was already turned on.'' The gas company's instructions ''to its employees when turning on a gas service . . . [were] to turn on the service to the meter, and then check the meter to see whether there is any gas leaking out, and then check the appliances, and draw the gas through to make sure that there is gas to the appliances.'' Partridge then ''went to the Cleveland apartment but could not get in; no one was at home.'' He never tried again nor did he leave any ''slip . . . under the door.''

On the evening of January 23, 1957, friends of the Clevelands came to call and found Cleveland and his wife on the kitchen floor. The baby was in the living room. Cleveland and the baby were dead on arrival at the hospital. Mrs. Cleveland died on January 28.

When the friends arrived the apartment had an odor ''but not the kind you get from just turning on the gas stove.'' The gas water heater was going and a flame was visible. A gas company employee inspected the premises shortly after the accident in the presence of a deputy fire chief. He reported ''that the burner on the water heater was in good working condition; that he found nothing wrong and saw no reason to shut off the gas.'' The trial judge took judicial notice that natural gas ''is an inherently dangerous substance.''

The gas company did not sell or install the water heater. See *DeLucia* v. *Lawrence Gas Co.* 340 Mass. 710, 712. There is no evidence that the gas company knew of the installation of the water heater or that it had no vents. The earlier heater, about which the gas company had commented

in 1951, had been removed. Nothing in the record suggests that the gas company had assumed any duty to the Clevelands with respect to the new heater unless it did so in connection with Partridge's efforts, discussed below, to connect service on December 26, 1956, and his failure to gain access, then or later, to the apartment to inspect the appliances. See *Cadogan* v. *Boston Consol. Gas Co.* 290 Mass. 496, 499–501. Cf. *D'Entremont* v. *Boston Consol. Gas Co.* 320 Mass. 582, 583–584.

Partridge testified that on December 26, 1956, he found the service "already turned on." If this was so, the gas company's instructions with respect to turning on service in terms were not applicable to him at all for he did not turn on the service. Disbelief of Partridge's testimony would not establish affirmatively that he did turn on the service. Even if he did turn on the service, although a broader interpretation of the instructions is possible, the gas company did not with clarity require more than checking the appliances to be certain that gas reached them.

In any event, there is no showing that turning on the gas on December 26, 1956, had such direct causal connection with the accident on January 23, 1957, as to impose liability upon the gas company. There was no proof that turning on the gas caused gas to leak from defective appliances in the apartment. Indeed, the Clevelands used all the appliances without incident, so far as the record shows, for about one month. As this court indicated in the *Cadogan* case (290 Mass. 496, 499–500), a gas company "at this late day . . . [may] reasonably assume that a householder . . . [is] sufficiently familiar[1] with . . . illuminating gas . . . to know . . . that it must not be allowed to escape and that it must be consumed in such manner as to avoid the accumulation in the house of toxic gases." It was also said in that case (at p. 501) that, even if the company was charged with

[1] That the Clevelands had the general knowledge of the dangers of gas, mentioned in the *Cadogan* case, is indicated by the circumstances that the Clevelands themselves had installed a combination gas-oil range "connected by a flue or vent pipe to the chimney" and that there was an "oil stove in the living room" similarly vented.

notice of the defect, "we should hesitate to say that the company could be held bound to anticipate that the unconnected water heater would be used continuously in a small room without any ventilation whatever long enough to become dangerous." In 1935, when the *Cadogan* case was decided, the gas consumed was not natural gas, but natural gas had been used in Northampton for at least five years by 1957 and the same general principles apply to it as to manufactured gas.

The language of the Northampton ordinance shows that it is directed at the installation and connection of heaters. See *Sun Oil Co.* v. *Director of Div. on the Necessaries of Life,* 340 Mass. 235, 238. No action taken by the gas company came within its terms. It cannot be construed to have broader application than is indicated by its plain words.

Verdicts were properly directed for the gas company.

*Exceptions overruled.*