MIGDALIA ROSADO, administratrix, *vs.* BOSTON
GAS COMPANY.

Nos. 88-P-487 & 88-P-488.

Suffolk.  April 13, 1989. — August 11, 1989.

Present: GREANEY, C.J., ARMSTRONG, & KASS, JJ.

*Negligence,* Gas, Adequacy of warning. *Proximate Cause. Evidence,* Expert opinion. *Joint Tortfeasors. Contribution.*

In a civil action against a gas company for the carbon monoxide poisoning deaths of two persons caused by an improperly vented space heater in their apartment, it was error to submit the case to the jury on the theory that the gas company had a duty to "check back" after disconnecting the space heater, which it did not own and had not undertaken to maintain, to see if it had been correctly installed; where it could not be determined whether the jury's verdict was based on this or another, correct theory of negligence on which the case was submitted, a new trial was required. [678-681]

In a civil action against a gas company for the carbon monoxide poisoning deaths of two persons caused by an improperly vented space heater in their apartment, it was error to submit the case to the jury on the theory that the gas company had a duty to train its meter readers to spot deficient appliance installations and to take action on the basis of their observations, e.g., turning off the gas to the dangerous appliance; where it could not be determined whether the jury's verdict was based on this or another, correct theory of negligence on which the case was submitted, a new trial was required. [682-683]

CIVIL ACTIONS commenced in the Superior Court Department on May 4, 1982, and May 14, 1982, respectively.

The cases were consolidated for trial and were tried before *Elbert Tuttle,* J.

*John B. Johnson* for the defendant.

*Michael E. Mone & John B. Rest (Patricia L. Kelly & Diane M. Meibaum* with them) for the plaintiff.

KASS, J.  We focus our inquiry on the extent of the duty of a gas company, a public utility, to guard a customer from the misuse of appliances which the gas company does not own and which it has not undertaken to maintain.

Migdalia Rosado, as administratrix of their estates, brought actions on behalf of Ismael Rivera, Sr. ("Rivera") and Ismael Rivera, Jr. ("little Ismael"), both of whom died on January 5, 1981, of carbon monoxide poisoning caused by an improperly vented gas space heater. She has obtained judgments, based on jury verdicts, of $1,440,000 and $2,100,000 on account of Rivera and little Ismael respectively.

At appropriate points during the trial the defendant moved for directed verdicts and, after return of the verdicts favorable to the plaintiffs, the defendant moved for judgment notwithstanding the verdicts. In testing the correctness of the denial of those motions, we look at the evidence in the light most favorable to the plaintiffs. *Everett* v. *Bucky Warren, Inc.*, 376 Mass. 280, 282 (1978). *Fiorentino* v. *A.E. Staley Mfg. Co.*, 11 Mass. App. Ct. 428, 429 (1981). We summarize the facts which the jury could have found on that basis.

On March 14, 1980, Calvin Hunter, a serviceman for Boston Gas Company, responded to a customer request by Migdalia Rosado to turn on gas for the first floor apartment at 35 Torrey Street, Dorchester. Rosado had just moved to those premises. While reading the meter in the basement, Hunter found that the gas was already on but, as part of the routine of his duties, he inspected Rosado's appliances to be sure they were operating safely. A space heater, Hunter found, was far from safe. It had not been vented, as required, to a chimney or flue stack and, as it was being operated, emitted products of combustion, such as carbon monoxide, into the kitchen and adjoining spaces in the apartment.

Hunter called the danger to Rosado's attention. He told her he would have to turn off the supply of gas to the space heater and that she must have her landlord (who had furnished the space heater) install proper venting for the space heater. In accordance with gas company procedures, he attached to the offending heater a red tag on which there appeared in bold black

print: "Warning/The condition referred to on the reverse side of/this card must be corrected immediately./ *Continued use of the equipment is at your own risk./* BOSTON GAS is NOT responsible for this condition!" On the back side of the warning tag there was a category of defective condition which said, "not vented properly."

Rosado gave the red warning tag to her landlord. She and Rivera made no further use of the space heater for the balance of that heating season. During the summer of 1980, Rivera undertook to vent the space heater on his own. He ran a series of elbows from the vent hole in the space heater and then ran pipe horizontally through a hole which he punched through the kitchen wall. On the outside he attached a clothes dryer vent cap with a damper. This was a grievously defective arrangement. The proper method of venting the space heater was to run piping no smaller than the opening on the appliance on a generally vertical course to a chimney or flue stack. The opening to the air should be unobstructed, i.e., there should not be a damper.

Venting a gas appliance, if properly done, requires a permit from the city of Boston and approval by a city gas inspector. In this instance no permit was obtained or inspection made. Rosado relit the space heater in the autumn of 1980 when the weather became cold. Neither Rosado nor Rivera called the gas company to turn the cock in the gas line to the space heater, which Hunter had left in the off position. Rivera did so himself. It was a task which ordinarily required a ten inch Stillson or adjustable wrench. During the milder weather, the Rosado-Rivera family (there were four minor children in the household) used the space heater without ill effect. When it grew colder in December, Rosado and Rivera put plastic over the windows, thereby shutting off vital replenishment of oxygen in the apartment.

January 4, 1981, was a particularly cold night. The temperature hovered around zero and below. Perforce the space heater ran constantly. Little Ismael awakened around 3:00 A.M. crying. Rivera, for his part, felt somewhat unwell. He and Rosado took little Ismael into their bed. In the morning, Rosado woke

to discover Rivera and their child dead. They had suffered carbon monoxide poisoning. Remarkably, the carbon monoxide had not been lethal to her.

The case went to the jury on three theories of negligence: First, that serviceman Hunter's warning inadequately emphasized the deadly hazard inherent in improper venting of a space heater and inadequately emphasized the importance of having the venting done by a plumber or a gas fitter; that it was not a do-it-yourself project. Second, that the gas company had a duty to check back to see if the space heater had been properly installed. Third, that the gas company had a duty to train its meter readers to spot deficient appliance installations and to take action on the basis of their observations, e.g., turning off the gas to the dangerous appliance. The gas company concedes that the adequacy of the initial warning properly went to the jury. See *Fiorentino* v. *A.E. Staley Mfg. Co.*, 11 Mass. App. Ct. at 434-435. If either of the other two theories, however, should not have gone to the jury, it would be necessary to order a new trial because we have no way of knowing on which basis the jury reached its verdict. *Friese* v. *Boston Consol. Gas Co.*, 324 Mass. 623, 631 (1949). *McInnis* v. *Tewksbury*, 19 Mass. App. Ct. 310, 314 (1985). *Kelley* v. *Stop & Shop Cos.*, 26 Mass. App. Ct. 557, 559 (1988).

1. *Duty of the gas company to have a "check-back" procedure*. Just precisely what constitutes reasonably prudent conduct in particular circumstances is generally left for a jury to decide, guided by instructions from the judge about the factors which the jurors should consider. James, Functions of Judge and Jury in Negligence Cases, 58 Yale L.J. 667, 676-677 (1949). So, for example, in cases in which a gas company has been placed on notice of a gas leak by reports of odor or unusual consumption, the question whether on the particular facts that gas company acted diligently to avert the ensuing explosion or asphyxiation goes to the jury. See, e.g., *Barbeau* v. *Buzzards Bay Gas Co.*, 308 Mass. 245, 247-248 (1941); *Wolff* v. *Buzzards Bay Gas Co.*, 353 Mass. 57, 59 (1967).

Courts set the outer limits of care so that a jury does not exact precautions beyond the bounds of reason. Holmes, The

Common Law 110, 112 (1881). James, op. cit. at 677. Prosser, Law of Torts § 37 at 206-207 (4th ed. 1971). Harper, James & Gray, The Law of Torts § 15.3 (2d ed. 1986). As Judge Learned Hand put it, "in most cases reasonable prudence is in fact common prudence," but "[c]ourts must in the end say what is required. . . ." *The T.J. Hooper*, 60 F.2d 737, 740 (2d Cir. 1932) (court decides that an ocean going tug must be equipped with a radio receiving set to be seaworthy). As applied to gas distribution, the following Massachusetts cases illustrate judicial setting of limits: *Cadogan* v. *Boston Consol. Gas Co.*, 290 Mass. 496, 499-500 (1935); *DeLucia* v. *Lawrence Gas Co.*, 340 Mass. 710, 712-713 (1960). *Wright* v. *Northampton Gas Light Co.*, 341 Mass. 461, 463-464 (1960). Those cases limited the duty of the defendants to act on the basis that the utilities neither owned nor undertook to maintain the malfunctioning appliances. See also *Bambus* v. *Bridgeport Gas Co.*, 148 Conn. 167, 170 (1961); *Banks* v. *City of Richmond*, 232 Va. 130, 136 (1986); *Webb* v. *Wisconsin So. Gas Co.*, 27 Wis. 2d 343, 349 (1965). Compare *Stewart* v. *Worcester Gas Light Co.*, 341 Mass. 425, 432-433 (1960), in which the court, after collecting conflicting authorities, left to a jury whether it was reasonably prudent to continue to allow gas to flow in an unused pipe. Contrast *Friese* v. *Boston Consol. Gas Co.*, 324 Mass. at 628-630 (defendant installed and maintained appliance) and *Reil* v. *Lowell Gas Co.*, 353 Mass. 120, 127 (1967) (gas company responsible for supply pipe to the gas meter under the company's control).

It is significant, as the cases reflect, whether the defect is in the gas supply system or in the appliance and, if in the appliance, whether the gas company owns it, sold it to the customer, installed it, or assumed a duty of keeping it in good order. See *Wright* v. *Northampton Gas Light Co.*, 341 Mass. at 463-464. That, however, is not the end of the inquiry. A utility could hardly ignore reports of fumes or other dangerous deficiency in an appliance. See *Miller* v. *Wichita Gas. Co.*, 139 Kan. 729, 733 (1934). When the gas company is on notice of a defect with potential for carbon monoxide poisoning it has a duty to call the defect to the customer's attention, to

describe the consequences, and to turn off the gas until the appliance is fixed. *Ibid.*

Here the gas company did call the inadequate venting of the space heater to attention, informed Rosado and Rivera that the condition was dangerous, reinforced the warning with a red warning tag, and turned off the gas. Whether that warning adequately communicated the danger and the need for trained mechanics to make the repairs was, as we have seen, for the jury. The plaintiff urges that the gas company, aware that a venting flaw in a space heater is life-threatening, in the exercise of due care should have checked back with Rosado to see if the space heater had been properly vented.

An expert called by the plaintiff testified that an Illinois gas company, for which he had worked in the early 1960's, had a policy of checking back with a heating inspector "for the very potentially serious problems" and that a utility serving Buffalo, New York, and environs had a check-back policy. Two gas companies in a large country do not a pattern make. The witness did not say whether the area served had municipal inspection procedures or whether the utilities assumed any responsibility for the appliances. At most, what the expert had to say on the subject of check-backs was that he, himself, regarded it as a good practice. His testimony could not be heard as establishing an industry standard.

In Massachusetts, a gas company has access to private premises for the limited purposes of checking the meter and removing the means of supply. G. L. c. 164, § 116. "This statute is not a tool of code administration." *Commonwealth* v. *Cote,* 15 Mass. App. Ct. 229, 233 (1983).[1] A check-back policy is, therefore, attended by some difficulties. Access for inspection would be at the sufferance of the householder, who may regard unsolicited visits from the gas man with suspicion. How soon should the check-back be made? Here a check-back after one, two or three months would have revealed no action but no

---

[1] In Wisconsin, by comparison, the State Public Service Commission requires gas utilities regularly to inspect customers' appliances, but the gas companies normally sell, install, and service the appliances. See *Savina* v. *Wisconsin Gas Co.,* 36 Wis.2d 694, 705 (1967).

danger, as the space heater remained unused and the gas supply to it shut off. How many times should gas servicemen then check back? There was evidence that ten to twelve red tag warnings issued in Dorchester per week. Were there a duty to check back as to each, the aggregate burden, ultimately borne by the rate paying public, of monitoring several hundred red tag cases would be considerable.

The check-back duty for which the plaintiff contends is too open-ended. A gas company is entitled to assume that a customer who has been warned will exercise a modicum of ordinary judgment. Householders may be expected to know that gas is dangerous. See *Cadogan* v. *Boston Consol. Gas Co.*, 290 Mass. at 500.[2] The gas company had shut off the gas to the space heater. Doing so was not, as we have set forth, a hand operation; a good-sized wrench was required.[3] In the circumstances, the company might expect that the active step of turning the gas back on will be taken after the defect has been lawfully attended to. When a public utility has warned a customer to repair an appliance for which the utility has assumed no responsibility of maintenance (indeed, has expressly disavowed such responsibility) and when the utility has turned off the gas to such an appliance, we think it imposes an unreasonable burden to require the utility to check back to ascertain whether the repair has been made and, if so, properly made. This is particularly so in a city, such as Boston, which maintains gas inspectors. If such a duty is to be imposed in a regulated industry, the proper source is legislation or regulation. The silence on this score of the body of statutory and regulatory material in Massachusetts is impressive.

---

[2] So much of the *Cadogan* opinion as limited the scope of an employee's authority to take the initiative to remedy dangerous conditions which the employee has observed, was impliedly overruled by *Pridgen* v. *Boston Housing Authy.*, 364 Mass. 696, 714 n.10 (1974).

[3] The plaintiffs' expert testified that it would have been better procedure to isolate the space heater by disconnecting the gas line which fed it and capping it. A single opinion, favoring a practice which would maximize expense and inconvenience to the customer, does not establish a legal duty to act.

2. *The duty of meter readers to observe and report dangerous installations*. Meter reader is an entry level job at the Boston Gas Company. In the course of a daily round, a meter reader in Boston will check from 200 to 300 meters. On November 25, 1980, a meter reader came to take a reading for the Rosado account. He was admitted by Rosado, walked through the kitchen and went down to the basement where gas meters for three apartments in 35 Torrey Street were located. He read the meters and left.

A meter reader who, in the course of work, smells gas or experiences stinging in the eyes (a sign that toxic gases are accumulating) may reasonably be expected to sense danger, to warn the customer, and to report to the company. See *Pridgen* ·v. *Boston Housing Authy.*, 364 Mass. at 711-715, dealing with the obligation of an owner of property to take reasonable steps (in that case turning off the power switch on an elevator) in an emergency situation to avoid injury.

Expecting or training meter readers to spot defective appliances or installations during the course of their rounds involves considerable inflation of the duty to react to peril made obvious by smell or stinging eyes. In the ordinary course of duty, the meter reader, on the way to the meter, may or may not enter space where gas appliances are located. Even as that meter reader passes through an area, the focus of attention, reasonably, is not on the ambience but on where the meter reader is going. In the instant case it was not possible to observe how the space heater was vented unless one inspected the appliance from the side or rear. Such an inspection would have revealed a vent pipe and would have required a trained eye, such as that of a gas company serviceman, to appreciate that the vent was faulty and dangerous.

No regulation has been called to attention which requires surveillance of equipment by meter readers during the course of routine rounds. Indeed, it would scarcely be possible to make 200 to 300 readings per day and also make inspections. Were meter readers to be trained to do so and required to do so, the cost would fall on the ultimate consumer. That may be an appropriate allocation of social cost, but it is an allocation which is legislative business.

Beyond reacting to a smell of gas, a hissing noise, stinging eyes (none manifested itself in the Rosado apartment on November 25, 1980,)[4] or other manifestation which impinges on the senses and alerts even the minimally trained, we do not think a gas company has a duty to train and require its meter readers to observe and report defects in equipment fueled by gas.

3. *Other issues.* On the view we take of the case the defendant is entitled to a new trial. It is not necessary, therefore, to reach the defendant's point that the damages are excessive. As to whether the defendant was entitled to a directed verdict on the issue of conscious suffering, we do not decide the point because the evidence may not be the same in a new trial.

Boston Gas Company is not correct that the right to contribution is fixed by the return of the jury's verdict. The right to contribution is fixed by the entry of judgment, which occurred after the plaintiffs' settlement with Locke Stove Company. See *Bishop* v. *Klein*, 380 Mass. 285, 293 (1980); *McIsaac* v. *Didriksen Fishing Corp.*, 809 F.2d 129, 136 (1st Cir. 1987).

It was error to permit a witness to answer whether the condition in the Rosado apartment called for the *highest* degree of care on the part of the gas company. The jury is to be instructed about the standard of care by the judge, not a witness. Moreover, tort liability is not measured by the *highest* standard of care, but by a standard of what is reasonably prudent in the circumstances. The standard is relative, so that what is ordinary and reasonably prudent care in a particular fact setting may require a quite high standard of care. See *Webb* v. *Wisconsin So. Gas Co.*, 27 Wis.2d at 350. We assume, in the event of a new trial, that the same question will not be asked.

*Judgments reversed.*

---

[4] The November 25th date on which the meter reader came was before Rivera and Rosado had sealed the windows with plastic, thus toxic buildup was unlikely.