LILLIAN E. MARCUS *vs.* GRIGGS, INC.

Hampshire.    April 2, 1956. — May 8, 1956.

Present: QUA, C.J., WILKINS, WILLIAMS, COUNIHAN, & WHITTEMORE, JJ

*Negligence,* Contractor, Repairs.    *Evidence,* Matter of conjecture.

In an action against a contractor renovating a house for injuries sustained by the plaintiff one afternoon when she struck her leg against the ragged edges of clamps on a pail of cement then standing in and obstructing an open area in the living room left as a "passageway" among cartons, boxes, a barrel and other objects, the evidence left it conjectural whether such situation then existing in the living room had been brought about by the only workman who had worked in the house on the day of the accident and who had left the pail somewhere in the living room when he quit work about two hours before the accident occurred, or by some other person, and the plaintiff could not recover.

TORT.    Writ in the Superior Court dated August 13, 1954.

The action was tried before *Meagher,* J.

*John J. O'Connell,* for the plaintiff.

*Robert H. Doran,* for the defendant.

WHITTEMORE, J.    There was no error in directing a verdict for the defendant in this action of tort.

The evidence taken most favorably for the plaintiff warranted the jury in finding the following facts: The plaintiff was injured about 3:30 P.M. on October 31, 1953, when, in the living room of the house at 51 North Pleasant Street in the town of Amherst in which she had begun to live the day before, she struck her leg against the ragged edges of "lips" or clamps protruding around the cover of a five gallon pail, black in color, containing paste or cement used in laying linoleum and linoleum tiles.    The house was the newly acquired home of Andrew Barselotti, in whose café the plaintiff was employed as a waitress.    Previously the plaintiff had lived in the former Barselotti residence elsewhere on

the same street. During October extensive remodelling and repairs were under way in the 51 North Pleasant Street house to prepare it for occupancy. Arrangements for installing linoleum or tile in all or parts of the bathrooms, pantry, kitchen, bedrooms, living room and dining room had been made with the defendant through Norman W. Brown, its president. The work was being done by Elmer Germaine. In the view we take of this case it is unnecessary to decide whether Germaine was an independent contractor or an employee of the defendant. Prior to moving in on October 30 the plaintiff had been in and out of the premises when the plumbers, carpenters, electricians, and painters were at work. The plaintiff handled the moving and signed the moving receipts, placed the furniture, and knew where everything belonged. On October 31 furnishings and containers waiting to be unpacked were about the house downstairs. In the living room there were miscellaneous things, including cartons, boxes, one barrel, utensils and dishes, but an open area had been left as a "passageway . . . an area that you can walk through." "There was always a pathway." At the time of the accident the subject pail was in this area and "would have obstructed the passageway." The plaintiff worked at her employer's restaurant from 8 A.M. to noon on October 31. She then came home, talked with Barselotti about straightening out the house but "didn't do any straightening out at that particular time," did personal laundry and fixed her clothes closets, saw Germaine putting down tile on the downstairs bathroom floor, and observed Brown come and direct Germaine to leave to go to another job which he did. This was about 1:30 or 1:45 P.M. when the plaintiff was preparing to get her lunch. Thereafter she went shopping and brought back some ice cream. When she went from the room where Barselotti was into the living room to get a spoon for his use in eating the ice cream she pushed against the linoleum paste pail, scraped her leg on it, and thereby sustained a cut. The place was "shadowy" (the plaintiff "wouldn't say it was well lighted") but she had no trouble in seeing her

way around and she agreed to the statement that "[t]hings were very visible . . . in the room so . . . [she] had no trouble seeing . . . . [T]he spoon was laying right there so she could put her hand on it, because she had been using . . . [sentence unfinished]." "[T]he cartons in the room were here and there and everywhere . . . [and the plaintiff] was in the effort of locating the one with the dish and spoon in it"; she did not have to step over the cartons." She had seen the drum in the living room before October 31 but it had always been underneath a window. On the day of the accident only Germaine was working on the premises, no painters were there because the house had all been painted, and the plumber had finished and gone. The "linoleum was laid in the bedrooms before the 31st of October; . . . the work was done by Mr. Germaine; . . . [the plaintiff] talked with Germaine and told him what tile was to go in the bathroom and . . . she saw him spread cement and put down tile and saw the container which contained the cement; on the day of the accident the dining room was completed; the living room had still the outside area to be tiled."

The following evidence is relevant to the issue presented: Germaine testified that on October 31 he worked on the premises only in the evening; that it was on October 30 that Brown told him to go to another job; that he saw the plaintiff while he was laying tiles in the bedrooms and bathrooms; that "the paste, linoleum and paper he left at the house . . . on the 30th of October in the living room . . . [where there] were paint pails, lamps, pictures, boxes, and cartons; . . . [that he left the pail] in the center of the room; . . . that he placed the pail of cement in among the cartons, and boxes . . . [i]n between the cartons and boxes where I could shove it in." He showed by pointing to a diagram just where this was, but the bill of exceptions does not inform us. Barselotti was asked (in respect of the open area in the living room), "And it was in that area where you saw the can?" (referring to what he saw just after the accident). He answered, "That's what I say. Was right in the area — I wouldn't say it was put there."

We may not assume that the specific place where Germaine showed that he put the pail "[i]n between : . . cartons and boxes" was in the open area where it was observed on the thirty-first after the accident.  The inference is that he testified to placing it elsewhere.  The evidence was sufficient to permit a finding that Germaine put the pail in the living room after finishing the last work which he did prior to the accident, and that this was either on the thirtieth or the thirty-first of October.  It was open to the jury to disbelieve Germaine as to the date and the particular place in the living room where the pail was put, but to believe him as to putting the pail in the living room.  And the evidence that the pail had been seen in the living room before is some evidence of a pattern of conduct from which it could be found that the pail was put in that room after the workman was through with it.  We must then determine whether the presence of the pail as an obstruction in the open space as it was constituted at 3:30 P.M. is some evidence that Germaine so placed it about one and three quarters or two hours before when, on the evidence most favorable to the plaintiff, he left the job.  We think on the evidence it was at least as likely that the pail stood as an obstruction of the 3:30 P.M. open space as a result of things done by another person and therefore that the element of conjecture remains significant.  Barselotti was in the house at noon.  He was lying down in his room at the time of the accident.  His movements in the interim are unaccounted for.  The likelihood of frequent trips to the living room to locate some item useful to a householder was great.  Barselotti's volunteered statement "I wouldn't say it was put there" was perhaps recognition by him of the possibility which the other evidence suggests that the pail arrived at its 3:30 P.M. position relative to boxes and cartons and to the open space then existing, as a result of the movement of the nearby boxes and cartons.  That the plaintiff had been in the room after Germaine left was not negatived.  If dishes and spoons used for lunch had been left in the kitchen or dining room it would not have been surely neces-

sary to go to the cartons for a spoon for Barselotti. The unfinished statement that the "spoon was laying right there . . . because she had been using . . ." and the statement that the plaintiff "was in the effort of locating the one with the dish and spoon in it" suggest the possible presence of the plaintiff in the living room after her lunch or after her return from shopping.

In determining whether the plaintiff had sustained the burden of proof the judge properly would appraise the force of all the relevant evidence, and when this is done, it is apparent, we think, that any inference that it was Germaine rather than another who caused the pail to be in its position at 3:30 P.M. relative to other objects and the open area is based on possibility rather than probability. This is not enough to take the issue to the jury. *Prushensky* v. *Pucilowski,* 269 Mass. 477, 479. *Burwick* v. *McClure,* 318 Mass. 626, 629–630. *LeBlanc* v. *Atlantic Building & Supply Co. Inc.* 323 Mass. 702, 706. See *Sargent* v. *Massachusetts Accident Co.* 307 Mass. 246, 250–251. It is unnecessary to determine whether it would have been a breach of a duty owed the plaintiff to have placed the pail in the position in which it was found. See *Collins* v. *Goodrich,* 324 Mass. 251, 253–254; *Flanders* v. *Pailey,* 320 Mass. 744, 745. Compare *Blackstone* v. *Chelmsford Foundry Co.* 170 Mass. 321, 322; *Cole* v. *L. D. Willcutt & Sons Co.* 214 Mass. 453, 456.

*Exceptions overruled.*