LOUIS D. REIL, JR. *vs.* LOWELL GAS COMPANY
(and four companion cases[1]).

Middlesex.    March 10, 1967. — July 7, 1967.

Present: SPALDING, WHITTEMORE, CUTTER, SPIEGEL, & REARDON, JJ.

*Negligence,* Gas.  *Proximate Cause.  Practice, Civil,* Auditor: recommit-
tal.  *Evidence,* Opinion: expert; Relevancy and materiality; Judicial
discretion.

A motion to recommit to an auditor whose findings were not to be final
is the proper method of raising the issue whether certain findings were
supported by evidence.  [125]
In an action for personal injuries sustained in an explosion in a sawdust
and wood flour plant, conclusions were warranted that the defendant,
a gas company supplying gas to the plant, had exclusive control of an
accessible gas service pipe in the plant and had a duty to inspect and
maintain the pipe, that galvanic corrosion in a union on the pipe due
to juxtaposition of dissimilar metals had been obvious for several years
before the explosion, that the defendant failed to perform such duty
of inspection and maintenance and was negligent thereby, that ulti-
mately the corrosion in the union brought about a break therein which
allowed gas to escape into parts of the plant, and that the explosion
resulted from a mixture of such gas and air and not from a mixture of
wood dust and air, and was proximately caused by the defendant's
negligence.  [126–128]
A conclusion by an expert witness at the trial of an action, that an explo-
sion in a sawdust and wood flour plant resulted from a mixture of air
with gas escaping from a broken gas service pipe in the plant, and not
from a mixture of wood dust and air, was amply supported by facts
which the jury could have found.  [132–133]
In an action against a gas company for personal injuries sustained in an
explosion in a plant allegedly due to gas escaping from a break in a gas
service pipe in the plant, certain standards subscribed to by the de-
fendant were relevant and admissible on the issue of control of the
pipe.  [134–135]
On the issue in an action whether an explosion, followed immediately by
a fire, in a sawdust and wood flour plant was due to gas escaping from
a break in a gas service pipe in the plant or to wood dust, the judge in
his discretion properly excluded evidence of other fires in the plant and
in another plant of the same proprietor.  [135]

---

[1] The plaintiffs in the other cases are Gordon Barton, James G. Alix, Fred
L. Beede, and George T. Baldwin.

FIVE ACTIONS OF TORT.   Writs in the Superior Court dated
April 21, 1961, September 19, 1961, and December 4, 1961.

Following the report of an auditor, the actions were tried
before *O'Malley, J.*

*Acheson H. Callaghan, Jr.* (*Paul J. Dolan* with him) for
the defendant.

*Raymond J. Kenney, Jr.* (*Clement McCarthy* with him)
for the plaintiffs.

WHITTEMORE, J.   The five plaintiffs had verdicts for per-
sonal injuries sustained in an explosion, or explosions,
followed immediately by a fire, on March 6, 1961, on prem-
ises of Louis O. Beede & Sons, Inc. (Beede) in Lowell
wherein sawdust and wood flour were manufactured, stored,
and packaged for sale.   The defendant excepted to rulings
on evidence, denial of motions to strike the auditor's report
or parts of it, the failure to direct verdicts for the defend-
ant, and the failure to give certain requested instructions.

The plaintiffs relied on evidence, including the auditor's
report, tending to show that the explosion or explosions
resulted from the escape of natural gas from a break in the
service pipe.   The defendant's experts testified that the
explosions were of wood dust and air, not attributable
to gas.

It was undisputed that after the fire a break was dis-
covered in the gas pipe between the street main and the
meter.   This break was in the so called sump room at the
base of the steel casings that housed the endless chain
bucket elevator which carried raw materials from the un-
loading platform to the top floor of the factory building.
The service pipe from the street main passed through this
ten foot square, masonry walled room and through other
adjoining rooms to the meter in what had been the boiler
room at an earlier time when the plant had been used as a
brewery.   The break was in a brass coupling or union that
joined two sections of the one and one-quarter inch iron
service pipe.   The auditor found, and the plaintiffs' evi-
dence at the trial tended to show, that this break had re-
sulted from galvanic corrosion due to the flow of electricity

between dissimilar metals, that is, the brass of the coupling and the iron of the pipe.

Apart from the other testimony favorable to the plaintiffs, the findings in the auditor's report, if properly admitted, were such as to take the cases to the jury.

The auditor found, as to the cause of the explosion and fire, as follows: "18. I find that the process of Galvanic Corrosion was occurring in the location in the 'Sump'; that this process had been proceeding for a period of at least ten years before March 6, 1961; that for 5 years prior to March 6, 1961 the corrosion was open and obvious . . . . 24. I find that it was inevitable that the process of Galvanic Corrosion occurring and proceeding at the union in the 'Sump' would eventually cause a break or hole in the gas line resulting in the leaking of gas, and that a hole or break approximately 3/10 of an inch by 4/10 of an inch did occur which allowed gas to leak; that this gas moved upward in the 'Sump' and in the building through many openings until there was explosive mixture of gas and air on all floors of the 'Brew House' in that part of the building which was nearest to Payton Street. 25. I find that on March 6, 1961, the natural gas and air mixture exploded; that within 10 or 15 seconds the entire front portion of the 'Brew House' from ground to roof was involved; that the explosion was immediately followed by fire which within one minute after the explosion involved all floors of the building; that within 10 or 15 seconds after the explosion, a substantial part of a brick tower at the top of the building disintegrated and fell to the street, that other portions of the roof of the building were blown off, that an employee on the top floor of the building was thrown off his feet and to the floor as the explosion occurred and other men on the ground floor were also thrown off their feet and to the floor by the explosion. . . . 29. I find that wood dust when suspended in the air in sufficient quantity, when ignited by a sufficient source of energy, will explode . . . . 30. I find that the explosion which occurred in the 'Brew House' was

consistent with, and caused by, a gas-air mixture, and was not consistent with wood dust, as a cause.''[2]

The auditor made no finding as to the ownership of the service pipe. He found (No. 9) that the defendant had made and sold gas in the Lowell district for sixty years; also (No. 21), that the service pipe from the main to the sump room was installed in 1897. On the issue of control of that pipe he made several findings. He found (No. 33) that the defendant had been a member of the American Gas Association since at least 1950, and that this association incorporated all applicable rules of the American Standards Association (A. S. A.) in its publications for the guidance of its members, and that the defendant, with other gas distribution companies, operated under the rules and standards of the A. S. A. He also found (No. 34) that the custom and usage of gas distribution companies, at least since 1955, has been that the company has exclusive control over all gas service pipes, that is, the pipes from the main to the customer's meter. He found that Beede first began to purchase gas from the defendant in 1957; that Beede in no way changed, modified or interfered with the gas pipe from the main to the meter; and that neither the defendant nor anyone else changed, modified or interfered with the gas

---

[2] The auditor's findings underlying this conclusion were stated in detail in finding 29 as follows: ''I find that the volume of such wood dust suspended in air necessary to result in an explosion is in the amount of more than 500 times the amount of wood dust which the Commonwealth of Massachusetts Department of Labor and Industries allows a factory to have in the air in which workers have to work and breathe; I find that at the time of the explosion the only places in the 'Brew House' where wood dust could have been suspended in the air in sufficient quantity to permit an explosion were within the confined walls of certain of the production machines in operation in the 'Brew House'; that if an explosion of wood dust had occurred within such a machine, it would have blown the walls of the machine outward; that it would have resulted in an explosion confined only to the machine, and would affect other areas of the factory only by a relatively slow process of fire spreading to other areas; I find that the only machine which showed any signs of an explosion from the inside outward was the vertical elevator; that the walls of the vertical elevator were constructed of heavy-gauge steel, and that these walls were blown outward by an explosion just a few feet above the place where the vertical elevator rises out of the 'Sump,' and a few feet above where the worm feeds sawdust into an opening in the elevator; I find that the explosion in the vertical elevator was caused by gas which had moved upward from the 'Sump' into the vertical elevator immediately above, and which gas also exploded at about the same time at points on all floors of the entire building.''

pipe during the period from 1955 to March 6, 1961, except
in one instance.  On February 1, 1957, nine months before
Beede bought the premises, an employee of the defendant
entered the sump room and removed a gas meter of the
defendant.  "22.  I find that service employees of the gas
company had been in the 'Brew House' premises [Beede's
premises] on the business of the gas company on at least 6
occasions from 1955 and before March 6, 1961; that they
replaced the meter in the boiler room on at least two occa-
sions between 1955 and 1958. . . .  36.  I find the pipe and
union referred to were in the exclusive control of the de-
fendant . . . at least since 1957 . . . that the defendant
Gas Company and only the defendant Gas Company had a
legal duty to exercise reasonable care to maintain the said
pipe and union in a reasonably safe condition for the trans-
mission of natural gas which it contained."

The auditor did not expressly find (as the trial evidence
showed) that Beede's employees used the sump room for
access to and maintenance of the hoisting machinery and
for removal of material that fell from the hoist.  He did
find, however (No. 10), that at the time of the explosion
there was a vertical and stationary steel ladder to allow
workers to descend into the sump room, that the base of the
vertical elevator extended into the sump room and there
was space in it for a person to stand upright.  The ladder
was reached through a bulkhead.  Air could pass from this
masonry enclosed room into the elevator openings.

On the issue of negligence the auditor found as follows.
(No. 14)  "[I]t is a principle well known in the gas distri-
bution industry that a copper base metal is not compatible
with iron and that joining these two metals at a place
where moisture is present will cause . . . 'galvanic corro-
sion.' "  The sump room was always damp; this condition
was obvious; (No. 17) the presence of the two dissimilar
metals would have been obvious and readily discoverable
on any routine inspection by a trained inspector; the gal-
vanic corrosion had been going on for at least ten years
before March 6, 1961, and for five years prior to that date

it was open and obvious; the defendant had never inspected the gas pipe in the sump room and had no provision or rules for periodic inspection of gas pipes located within the premises of its customers. The auditor also found (No. 16) that the union was made of a substandard copper based alloy, making it brittle and likely to break or crack and was unsuitable and improper metal for construction of a pipe or union which was to be used in the transmission of gas.

1. We consider together the motion to strike the auditor's report and so much of the motion to strike parts of the report as specifies the auditor's ultimate conclusions and certain subsidiary findings on which those conclusions depend.

The defendant submitted to the trial judge a partial transcript of testimony before the auditor to support its assertion that the auditor's "conclusion of responsibility is not warranted by the evidence of the four experts who testified." This was not correct procedure and the judge rightly disregarded the contention. Even though Rule 90 of the Superior Court (1954) is inapplicable to an auditor's report that is not final (see Rule 89), a motion to recommit is the proper means of dealing with a report containing findings not supported by any evidence. *Levovsky* v. *Horvitz,* 307 Mass. 475, 480.

There is nothing in the assertion of the motion that the auditor merely copied all the plaintiffs' requests for findings; there was no basis at the trial for going outside the report to ascertain this. Another asserted ground for striking the report was that the "auditor's conclusion of responsibility is inconsistent with the subsidiary facts found by him." We see no inconsistency. This leaves the only issue under this motion whether the auditor's conclusion of responsibility "is based on an erroneous conception of the law to be applied to the case." This raises an issue under G. L. c. 221, § 56,[3] as does the motion to strike find-

---

[3] "The auditor's findings of fact shall be prima facie evidence . . . ; but the court at the trial shall exclude any finding of fact *which appears in the report* to be based upon an erroneous opinion of law, or upon inadmissible evidence" (emphasis supplied).

ings 87, 88 and 90.[4]   The assertion of error in the ultimate findings is that they are based on an erroneous conception of the law and are unsupported by any subsidiary findings.

The auditor's conclusion of causal relation between the break and the explosion is fully supported by his subsidiary findings.   The defendant relies on findings 27 and 28 to show a break in causation.   We disagree.   Although the auditor (No. 27) was "unable to ascertain . . .   the nature or source of the exact energy which ignited the gas-air mixture," it was enough to find (No. 28) "that any one of the many and unavoidable sources such as occur when metal contacts metal would be of sufficient energy to ignite [the] gas-air mixture."   The plant was in operation at the time of the explosion (No. 26) and the machines and electric motors were operating.

The defendant's chief concern in respect of causation is the asserted absence of any direct evidence that there was a break in the pipe before the explosion.   But any uncertainty as to the time of the break arises only from the testimony of the witnesses at the trial.   The auditor's report, as set out above, did find expressly that the galvanic corrosion caused a break in the gas line from which gas moved into the building and, on March 6, 1961, exploded.   There were thus adequate subsidiary findings.   Compare *Deyo* v. *Athol Housing Authy.* 335 Mass. 459, 463; *Larson* v. *Brockton Agricultural Soc.* 344 Mass. 463, 465.

The critical issue in respect of the report, and indeed, the whole of the plaintiffs' case, is whether, on the facts found, the conclusions were warranted of a duty of care and a failure in that duty.   For reasons to be stated we hold that these conclusions were warranted.

The defendant used as the means of conveying its product

---

[4] "87.   I find that the defendant failed to exercise reasonable care for the inspection and maintenance of the pipe and union here involved, and further find that the defendant failed to comply with the standards for inspection and maintenance provided by custom and usage in the gas distribution industry, including applicable A.S.A. standards.   88.   I find the defendant, by its agents and servants, was negligent."   "90.   I find that the negligence of the defendant was the cause of the explosion and the injuries and damages which were incurred by the plaintiffs."

to the meter in the boiler room a pipe with a union that was subject to corrosion because of contact with a dissimilar metal. Whether it owned the service pipe or some of it, or installed the union and the pipe, is beside the point. The sump room was accessible. The defendant's gas had at one time been metered there. At whatever time it elected to place in the boiler room its means for measuring its gas for sale, it was under a duty to see that the pipe it was using, at least so far as visible and hence subject to inspection, was reasonably fit for the use to which the defendant was to put it. Particularly with an accessible union which was subject to deterioration, there was a continuing duty to inspect and take steps to replace the part when deterioration appeared. See n. 6.

The defendant had a statutory right of access.[5] It exercised this right freely and without objection by Beede. The defendant had a right to insist, as a condition of supplying its product, that where the pipe used for that purpose went through a room used by others, the pipe be so protected that action of others would not disturb or break it. It had a right to install whatever shield or support was necessary to furnish such protection or, alternatively, to decline to deliver gas through the pipe.

We construe the finding of "exclusive control" (No. 36) to mean that the defendant had the right of access to the

---

[5] General Laws c. 164 § 116 (prior to its amendment by St. 1961, c. 305, § 1, effective June 28, 1961), read as follows: "An officer or servant of a gas or electric company who is duly authorized in writing by the president, treasurer, agent or secretary of said company, may at any reasonable time enter any premises supplied with gas or electricity by such company for the purpose of examining or removing the meters, pipes, wires, fittings and works for supplying or regulating the supply of gas or electricity and of ascertaining the quantity of gas or electricity consumed or supplied; and if any person, directly or indirectly, prevents or hinders such officer or servant from so entering such premises or from making such examination or removal, such officer or servant may make complaint to any court or magistrate authorized to issue criminal process, who may thereupon issue a warrant directed to the sheriff or to any of his deputies, or to a constable of the town where such company is located, commanding him to take sufficient aid and repair to said premises accompanied by such officer or servant, who shall examine such meters, pipes, wires, fittings and works for supplying or regulating the supply of gas or electricity, and ascertain the quantity of gas or electricity consumed or supplied therein, and shall, if required, remove any meters, pipes, wires, fittings and works belonging to said company."

service pipe in the sump room and to make changes therein and to exclude others from doing anything to it. This was a mixed question of law and fact and the defendant's motion to strike this finding was on the sole ground that it is based on an erroneous conception of the law.

The concluding part of finding 36 was only a ruling of law and had it been erroneous it should have been struck. It was, however, essentially right and stated the legal premise on which the auditor based his ultimate findings for the plaintiffs.

The defendant's brief concedes that "the decisive factor in imposing the duty of inspection should be the means of access and extent of actual control." Power and duty to exercise dominion over the service pipe is enough. Even if the jury found that the defendant had not exercised physical control of the service pipe at any time, this would not lessen its obligation.

The findings are fully adequate for the conclusion of failure in due care. Compare *Metevia* v. *Athol,* 348 Mass. 274, 282–283. The defendant specifically attacks finding No. 87 (see above) as unsupported by any subsidiary finding. It is plain that the auditor made no findings as to the rules of the industry specifically applicable to the inspection and maintenance of service pipes. Nevertheless, the conclusion that the defendant "failed to comply with the standards for inspection and maintenance provided by custom and usage in the . . . industry" was supported by the finding that, by that custom and usage, the defendant had control of the service pipe, taken with the inescapable inference that reasonable care of a pipe under the defendant's control was required.[6]

---

[6] The defendant did not specify as a finding to be struck No. 33 (see above) that the defendant operated under industry rules and standards. Its objection to No. 34 (industry custom and usage put exclusive control of the service pipe in the supplier) was only that it was based on an erroneous concept of law. Even though the issue of control of a buried service pipe was not involved in this case, the finding of a custom and usage of control of service pipes was relevant. The issue of law was whether, that being the custom and usage, there was responsibility at least as to an accessible, inadequate pipe, and the auditor's findings are soundly based on the particular facts.

Although the precise issue has not arisen in our cases, our holding is consistent with them and is to a degree foreshadowed by statements in certain of the opinions.

In *Black* v. *Boston Consol. Gas Co.* 325 Mass. 505, 508–509, we said: "The fact that the defendant did not lay this main in 1906 does not exempt it from liability if the jury found that it ought to have ascertained during the fourteen years it maintained this distributing system that the main was laid upon hardpan within the frost zone and that the roots of the tree located in the gutter were apt to interfere with the main, which was only four feet away. The damage done by the roots of this tree to the tar sidewalk was obvious and antedated the break by a long time. The damage which the roots were causing to the sidewalk might reasonably cause one to anticipate that damage might be incurred by the gas main especially since the tree was nearer to the main than it was to the sidewalk. The jury also had before them evidence that the defendant had no system for the inspection of the mains except to observe them as they were exposed when the city or some other agency happened to be making some excavation in the public ways for its own purposes. . . . The jury were warranted in finding that the defendant should reasonably have anticipated that a break might occur; that it negligently failed to prevent it; and that the defendant did not exercise reasonable care in the maintenance and supervision of its gas main used by it to convey a substance of a dangerous nature having a tendency to escape, which, if not kept confined to the main, might result in serious harm to another." (Citing numerous cases.) See *Stewart* v. *Worcester Gas Light Co.* 341 Mass. 425, 431–432, in which the original papers show a stipulation that the gas company owned the service pipe; *Wolff* v. *Buzzards Bay Gas Co. ante,* 57. Compare *Bristol Wholesale Grocery Co.* v. *Municipal Lighting Plant Commn. of Taunton,* 347 Mass. 668, 669, 673 (no finding or basis for a finding of control of a steam service pipe).

Other cases are distinguishable. In *A. DaPrato Co.* v. *Boston,* 334 Mass. 186, 188, we held that reasonable care did not require the digging up of buried water pipe for inspection, where there was "no evidence . . . that the pipe . . . was of a kind which after the length of time it had been in the street could not safely be used." In *Musolino LoConte Co.* v. *Boston Consol. Gas Co.* 330 Mass. 161, 164, we held that the mere fact that gas escaped from a break in a gas main laid in a street many years before did not warrant a finding of negligence on the part of the gas company. The court noted that the defendant there had control over the pipe in only a limited sense and no control over the surrounding circumstances. Compare also *Artz* v. *Hurley,* 334 Mass. 606, 608 (negligence could not be inferred from failure of the defendant to inspect a water closet float).

There are cases elsewhere which place in the supplier responsibility for the service pipe up to the meter. Some of them state rules beyond that which determines this case. *Mattson* v. *Central Elec. & Gas Co.* 174 F. 2d 215 (8th Cir.), cert. den. sub nom. *Central Elec. & Gas Co.* v. *Mattson, Admr.* 338 U. S. 868 (duty of supplier to know probable life of gas line). *Griffin* v. *McKneely,* 101 Ga. App. 811, 818. *Weiss* v. *Gas Serv. Co.* 170 Kans. 43, 48. *Manning* v. *St. Paul Gaslight Co.* 129 Minn. 55, 57. *Daugherty* v. *Nebraska Natural Gas Co.* 173 Neb. 30, 33. *Lovell* v. *Las Cruces,* 54 N. M. 358. *Northwestern Ohio Natural Gas Co.* v. *First Congregational Church,* 126 Ohio St. 140, 160. *Lone Star Gas Co.* v. *Veal,* 378 S. W. 2d 89, 91–95 (Tex. Civ. App.), and cases cited. *Stenger* v. *Hope Natural Gas Co.* 141 W. Va. 347, 353.

The rule that the supplier has no responsibility for a service pipe not shown to be owned by it should not be applied to the instant facts. See *Clare* v. *Bond County Gas Co.* 356 Ill. 241, 244; *Holsclaw's Admr.* v. *Louisville Gas & Elec. Co.* 267 Ky. 56, 63; and *Steele* v. *Peoples Natural Gas Co.* 386 Pa. 439, 445.

2. What we have said disposes of most of the attack on

other specific findings of the auditor's report. Findings 17 and 18, relating to galvanic corrosion, for the reasons stated above, are not, as the defendant alleged in the motion, based on an erroneous conception of law. Finding 24 does not fail because of the absence of a precise finding of when the leak occurred.

The asserted basis for moving to strike No. 35 (that it is contrary to the evidence and other findings) is, we assume, based on the reference in the finding to a "hole in the pipe." We think it plain that the auditor was referring to the break in the brass union and in its joining with the iron piping, treating the entire assembly as the service pipe. The finding was in order.

Finding 37, in respect of an act of dominion over the corroded pipe some weeks after the explosion and fire, was, in effect, struck by appropriate words in the supplementary charge.[7]

The defendant's brief specifies certain findings relating to the failure of the defendant's employee, John Garland, to discover the corrosion, as a reason why the motion to strike the findings should have been allowed. The findings specified are 13, 17, 18, and 19. Findings 17 and 18 were referred to in the motion but they do not relate to Garland. Findings 13 and 19[8] do relate to Garland but, as they were

---

[7] "[T]here is testimony that . . . [Joseph C. Purcell] forbade somebody from removing a pipe from the sump room. That was contained in the Auditor's Report, and I instruct you to disregard it completely, that portion of it, because there is no evidence offered here that he had any such authority . . . to bind the Gas Company in doing it. . . . . So I tell you to disregard it completely . . . . It is in the Auditor's Report, and I am instructing you to strike it from your consideration of the evidence that is in this case."

[8] 13. "[T]hat neither the defendant Gas Co. or anyone else changed, modified, or interfered, with these gas pipes from 1955 to and including March 6, 1961, except in one instance, namely on February 1, 1957, nine months before the Beede Corp. agents and servants acquired ownership of the premises; that on this particular instance one John Garland, a witness and employee of the defendant Gas Co., and then acting within the scope of his employment, entered the 'Sump' and removed a gas meter, the property of the defendant Gas Co., and which until that time had been connected into the gas pipes; that the employee John Garland left an unused gas pipe suspended and unsupported; that he knew it was suspended and unsupported and knew it was his duty to provide proper support for such an unsupported pipe." 19. "I find this corrosion was open and obvious to the naked eye on February 1, 1957 when the employee John Garland removed a meter from a point

not specified in the motion, no error is shown in failing to strike these findings or part of them.[9]

3.  The defendant's brief, in its argument for directed verdicts, lays stress on asserted deficiencies in the evidence taken at the jury trial. The auditor's report, as noted, was such as to take the cases to the jury. Nevertheless we examine certain of the defendant's contentions based on the testimony at the trial.

An expert witness, Roderick J. Cowles, testified that in his view it was a gas explosion and not a dust explosion. In his opinion, "it had to be gas that caused this explosion." He supported this view with good reasons.[10] The jury therefore could conclude that it was a gas explosion if there was any reasonable basis for concluding that gas

approximately four feet away from the point where the galvanic corrosion was occurring; that his view of the place of the corrosion was unobstructed and if he had looked he would have seen it."

[9] We note further that the defendant requested the judge to instruct (request No. 5) that "Garland did not have any legal obligation to inspect the pipes in the sump when he removed the meter," and, as the defendant's brief asserts, the judge "correctly charged . . . that there was no evidence in the case *at the trial* that Garland had any other duty than to remove the meter . . . [and] that the scope of an employee's duty was a question of fact, and, if Garland was a meter man, he had no duty to inspect and correct deficiencies in the pipes." There was no request to charge specifically in respect of the auditor's findings about Garland.

[10] (1) The walls of a room designated as "Room R" and the casing of the vertical bucket elevator were bulged out in a manner indicating that these were primary points of explosion. (2) The confined areas of Room R and the elevator casing provided pockets where escaping gas could reach explosive concentration. (3) The "fire engulfed or exploded in a room where there was no activity . . . . There was nothing going on in Room R." (4) In sawdust operations, the places most likely to have sawdust in sufficiently high concentration to cause an explosion are inside the operating equipment. (5) In the grinder and other machinery, there was "no evidence of any . . . bulging." (6) For a sawdust explosion to occur, a concentration 500 times the maximum density allowed by State regulation would have to be present. With this concentration, the employees on the premises would hardly have been able to see each other. Every room would have to have been filled with sawdust for an explosion of this magnitude to occur. (7) Sawdust "propagates much slower than gas, and it would probably have . . . [taken] minutes instead of seconds . . . [for the fire] to go from one section to another." (8) "The only places in the plant where there would be a sufficient concentration of wood flour to . . . [support] an explosion were inside of the cyclone separators which took off the wood dust near the pulverizing room, and in the pulverizer itself . . . ." On inspection, he discovered no evidence of an explosion in any of them. (9) As described by some of the witnesses, the explosion, or first "loud" explosion, was throughout the plant, and was followed immediately by a fire. Cowles' opinion would not be altered if there were several explosions, as certain witnesses testified.

could have been leaking into the premises. There was such a basis. Hence the expert's opinion was not "invoked to supply the substantive facts necessary to support his conclusion." For such a case see *Ruschetti's Case,* 299 Mass. 426, 431. The other relevant facts, as the jury could have found them, were the fractured union, a weakening in the metal that at some point in time gave way instantaneously; a detection of the odor of gas at the sump room entrance, but only very close thereto, after the fire; and the inability to get gas in the office heaters on the morning after the fire. Beede used gas only for those heaters. The defendant's brief relies on the lack of evidence that the heaters had failed at the time of the fire. There was, however, evidence that there were electric heaters in the office, and that the gas heaters were used to supplement them. The jury, notwithstanding evidence that the bills for gas had continued in substantial amounts, were not obliged to conclude that the gas heaters had been in use on March 6, 1961, at the time of the fire.

Although, as one metallurgical expert (called by the plaintiffs) testified, it was just as likely from the physical evidence that the fracture of the union occurred after the fire as before, the jury could weigh, with this evidence, the testimony that the explosion had the characteristics of a gas explosion.

The judge rightly instructed that experts' opinions based on assumptions are not of value if the jury do not find the assumed facts. Cowles agreed on cross-examination that, for his opinion, he assumed that gas was leaking before the explosion. This testimony recognized that if gas had not been leaking the explosion could not have been due to gas, and did not weaken the force of his other testimony that the explosion had the attributes of a gas, and not a dust, explosion.

*Milch* v. *Boston Consol. Gas Co.* 341 Mass. 230, is distinguishable for in that case there was no basis for an opinion that escaping gas was a more probable cause of the explosion than any other. There was no direct evidence of a

break in any pipe or main. Compare also *Nass* v. *Duxbury,* 327 Mass. 396, 401 (a guess is not enough); *Marcus* v. *Griggs, Inc.* 334 Mass. 139 (equally likely that a pail, on which the plaintiff injured herself, had been moved by another person after the defendant had left).

The testimony that no one smelled gas before the explosion is not conclusive. There was evidence of other odors in the plant and from another industrial plant in the neighborhood.

The views of the defendant's experts that forces directly or indirectly related to the explosion caused the break, that some force applied to the outside of the pipe caused the fracture, and that the explosion was a dust explosion, were ably and fully presented, but they did not require findings for the defendant. Incidentally, we note that the circumstance of an external force operative at some time is suggested by the appearance of the broken union and the evidence that it was made of brittle metal. But this would not exclude a finding that the pipe, in whatever condition it was before the break (perhaps already weakened by external force), developed the leak before the fire. The defendant's responsibility would not be negatived by the circumstance of outside force contributing to the fracture.[11]

The defendant, as a part of its argument that verdicts should have been directed for it (but not as an independent ground for sustaining its exceptions), asserts that there was error in the admission of portions of the A. S. A. standards. We disagree. The standards, to which according to testimony the defendant subscribed, had relevance to the issue of control of the service pipe. The defendant's brief notes that the standards were applicable to equipment "up to the outlet of the customer's meter set assembly." This

---

[11] There was evidence that a wire sling extending from the service pipe gave some support to another pipe beneath it; also that the sump room was found to be filled with sawdust after the fire. We do not overlook the circumstance that the corrosion, as determined by the nature of the metals, was entirely in the base metal, that is the iron of the pipe, although the fracture was in the brass union. There was, however, testimony for the plaintiffs that the product of corrosion had caused internal stress on the union. Also, the threads on the iron pipe were so corroded as to afford little engagement with the threads of the brass union.

warranted an inference of responsibility of the supplier for the pipe up to the meter. Accepting the defendant's view that certain sections of the code refer only to inspections in connection with installation, nevertheless another section remains relevant. We quote from the defendant's brief: ''The relatively small portion of section eight of the code that deals with operation and maintenance, exclusive of installation, provides: 'Because of many variables, it is not possible to prescribe in a national code a set of operating and maintenance procedures that will be adequate from the standpoint of public safety in all cases without being burdensome and impractical in all.' '' This section did not in any way negative the implication of control of the pipes up to the meter; indeed it recognizes such control, and leaves inspection standards to the particular case. It implies a requirement of due care in the circumstances.

The other evidential exceptions, which are not relied on apart from the argument for directed verdicts, relate to issues which we have discussed and do not warrant separate consideration.

4. It was not error to exclude evidence of other fires. This was within the discretion of the judge. *Robitaille* v. *Netoco Community Theatre of No. Attleboro, Inc.* 305 Mass. 265. The excluded testimony described fires which occurred at the Beede plant in Lowell (1) on January 3, 1961 (''friction sparks, motor, third and fourth floors involved''), and (2) in October, 1959, caused probably by sparks from a motor. Other testimony offered and excluded related to fires at another Beede plant in Lynn on (1) June 28, 1955; (2) July 27, 1955; (3) August 2, 1955; (4) October 20, 1955; and (5) June 11 to June 14, 1960, when fire started in a barn. On that occasion, two trucks in the barn were destroyed and several explosions occurred in the barn during the fire. There had been sawdust in the barn. We think the judge rightly concluded that evidence of these fires would have been of little help in determining the cause of the explosion on March 6, 1961. The argument for the admission of the evidence of fires to show that ex-

plosions are likely in a sawdust plant is not strong. That there were unexplained explosions in the course of the fire in the barn in Lynn did not even suggest that a dust explosion was the cause of that fire. There was ample testimony that certain mixtures of wood dust will explode.

5. We discern no error in the denial of the defendant's requests. The judge, in view of the auditor's report, was not obliged to charge (No. 8) that there "is no evidence as to when the union fractured." It was appropriate for the judge to deal with the issue of causation as he did, that is, to instruct that the jury must find whether, as the plaintiffs claimed, it was a gas explosion and that if they found that there was no gas explosion they "would find for the defendant." This in substance gave request No. 9. It was not necessary to state in express terms (Nos. 2, 3, and 17) that the plaintiffs' could not recover unless the union fractured and gas was escaping before the explosion or fire. The charge as to control (see requests No. 4 and 26) was fully adequate. The judge said, "Who had control of the pipes? Naturally, if the Gas Company was not in control of the pipes, then they would not be required to do anything concerning the pipes. If they were in control of the pipes, then there would be a certain duty owed . . . ." It was not necessary to charge (No. 6) that there was no statutory duty to inspect. In the circumstances there was, as we have ruled above, "a common law duty to inspect" (No. 7; see also No. 10). Whether to charge that a particular section of the industry code did not impose a duty to inspect lay in the discretion of the judge. The legal duty did not stem from the code; the significance of the code was in the defendant's adherence to standards that included control up to the meter. As to request No. 24, the judge could not have charged that there was no evidence that the defendant should have had knowledge of a condition of the pipe requiring attention. Express knowledge of a potentially dangerous condition (brass in contact with iron) could have been inferred. The judge was not re-

quired to state that there was no evidence of a custom requiring regular inspection (No. 25).

The charge on contributory negligence was adequate. Fred Beede's position with the corporation (Beede) did not warrant a charge that his recovery was barred because of the failure to have fire doors and sprinklers operating (Nos. 11 and 13).

6. We have considered all the points argued. The entry in each case must be

*Exceptions overruled.*