ROBERT WILLIAMS, INC. *vs.* JAMES FERRIS & others, trustees [1] (and a companion case [2]).

Essex. November 7, 1968. — February 4, 1969.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, KIRK, & SPIEGEL, JJ.

*Negligence,* Water pipe, One owning or controlling instrumentality. *Practice, Civil,* Charge to jury.

In actions for water damage to property of the plaintiffs caused by freezing and bursting of an eight-inch water pipe in a pump house neither owned nor occupied by the defendants but located in a right of way adjacent to a storehouse of the defendants equipped with a sprinkler system connected through smaller pipes to the eight-inch pipe, a finding that the defendants' predecessor in title and later the defendants had exercised control over the pump house sufficient to protect their interest in the pipes was warranted by evidence that they had run an electric line from the storehouse to a compressor in the pump house, had installed in it an electric heater, had placed a padlock on its door, and had enclosed the eight-inch pipe by wooden boards [292]; and a finding of negligence on the part of the defendants was warranted by evidence that no one had seen whether the heater was working for several years prior to an early March day on which the freezing and bursting of the eight-inch pipe occurred after a period of below freezing temperatures and while the pump house was without electricity and heat [293].

---

[1] The city of Lawrence was named as a defendant in each action but had verdicts on the counts against it.

[2] The plaintiff in the companion case is The H. Berger Paper Company.

At the trial of actions for water damage to property of the plaintiffs caused by the freezing and bursting of an eight-inch water pipe not owned by the defendants but in a pump house located in a right of way adjacent to a storehouse owned by them and equipped with a sprinkler system connected through smaller pipes to the eight-inch pipe, where it appeared that there was evidence of some acts of control of the eight-inch pipe by the defendants, there was prejudicial error in the judge's failure to instruct the jury, as requested by the defendants before and after his charge, in substance that the jury should determine whether the defendants had taken charge of the pipe as owner and had so acted with respect to it as to suggest to all concerned that it was being looked after, or had merely acted with respect to it in order to protect the flow of water into their sprinkler system, without acting as owner. [295]

Two ACTIONS OF TORT. Writs in the Superior Court dated May 6, 1963.

The actions were tried before *Beaudreau,* J.

*Thomas D. Burns (Stephen N. Subrin* with him) for the defendants.

*Stanley H. Rudman* for the plaintiffs.

WHITTEMORE, J. The plaintiffs in two actions of tort had verdicts on counts against the defendants as trustees of Buy-Rite Realty Trust for water damage to property caused by the bursting of an eight-inch water pipe in the city of Lawrence on March 7, 1963. An auditor, whose findings were not final, found that the pipe was in the exclusive control of the defendants and that the plaintiffs sustained damage as a result of the defendants' negligent failure to protect the pipe adequately against freezing. The cases were presented to the jury on the auditor's report and other evidence. The subsidiary facts as found by the auditor or shown in the other evidence are not in dispute.

The defendants' exceptions raise these issues: (1) did the defendants have control sufficient to warrant a finding of a duty to exercise due care to keep the pipe from freezing, (2) could the jury find a breach of that duty, and (3) was the issue of control left to the jury with proper instructions.

1. The defendants, under a deed to them dated October 26, 1956, owned and occupied a storehouse (No. 6) located on Canal Street, Lawrence. The eight-inch pipe in which

the break occurred was located in a so called pump house in a right of way adjacent to the defendants' premises. It was connected with the city water main and its only purpose was to supply water to the sprinkler system in storehouse No. 6 through four four-inch pipes. The defendants neither owned nor occupied the pump house.

Storehouse No. 6 and the pump house had been owned by Pacific Mills, a corporation and the owner of a complex of mill properties.

The deed of storehouse No. 6 given in 1938 by Pacific Mills to the predecessor in title of the defendants contained the following language: "The grantor conveys to the grantee all its right, title and interest to the dry valve,[3] so called, and pressure pump and all connections belonging thereto, located in the pump house of the grantor, also granting to the grantee the right to keep the same in the grantor's pump house, so long as said pump house is maintained at its present location. The grantee is to have access to said pump house, for the purpose of operating his said machinery therein, until such time as said valve and pump can be conveniently removed to the granted premises."

The sprinkler system in storehouse No. 6 was a dry system in which, between the water supply and the sprinkler pipes, there were valves that separated the air under pressure in the sprinkler pipes from the water in the pipes on the water side of the valves. In such a system, upon the opening of the sprinkler heads, the pressure is released and the water flows through the valves and the sprinkler pipes.

In 1938, in addition to the dry valves in the four-inch pipes, other equipment in the pump house consisted of a compressor that maintained the requisite air pressure in the sprinkler pipes and a pump or pumps for drawing water from the Essex Canal. The pump or pumps were removed in 1941.

For a time, Pacific Mills purchased and supplied current to operate, in the pump house, the pumps, the compressor,

---

[3] There were in fact four dry valves to which the grant relates.

and eight strip heaters. Pacific Mills shut off the current in 1946 and thereafter for some years there was no heat in the pump house. The chief engineer for Everett Mills and Wood Mill (inferentially mills in the Pacific Mills complex) from 1941 to 1950 "maintained" the dry valves and compressor in the pump house. If the compressor or dry valves went wrong he would fix them.

After Pacific Mills shut off the current, James Ferris, one of the defendants, then an officer of the corporation that was the predecessor in title, caused an electric line to be run to the compressor from storehouse No. 6. At some time, in 1946 or before, Ferris placed a padlock on the pump house door and retained the keys. Before that time, entry to the pump house had been by means of a rod-like key which hung inside the pump house beside an unlocked window. In 1956 or 1957 Ferris caused the dry valves and the compressor to be relocated in storehouse No. 6. Until then Ferris had periodically inspected the dry valves. At the suggestion of the man who removed the equipment, Ferris at that time caused the eight-inch main in the pump house to be boxed in with wooden boards. After the removal of the equipment from the pump house, Ferris gave one of the padlock keys to the yardman for the then owner of the right of way where the pump house stood (but who was not the owner of the pump house). A key to the pump house was in the office of the city of Lawrence water department from 1955 on. In 1959 Ferris observed that some windows in the pump house were broken and he caused an electric strip heater to be installed under the wooden box that enclosed the eight-inch pipe. The current was supplied by the line that ran from storehouse No. 6.

Beginning a number of years prior to March 7, 1963, no one other than the defendants exercised any control over the eight-inch pipe. Pacific Mills transferred its title and obligations in 1957 to Twindustries, Inc. (name later changed to Rowland Industries, Inc. [hereinafter Rowland]). That corporation in the same year executed a deed of like tenor in which the city of Lawrence was the named grantee

and thereafter assumed that the city was the owner.[4]  It does not appear that the city took any action under or because of the deed to it.

It is apparent that the defendants had an interest in the maintenance of the eight-inch pipe and the four-inch pipes in the pump house.  The jury could find that, after the pump house had been left without requisite maintenance by its owner, the owners for the time being of storehouse No. 6, including the defendants after 1956, exercised control over the pump house in order to protect that interest.  In the circumstances it could be concluded that they had a right or color of right to do this.[5]

It is unnecessary to determine the defendants' precise rights.  The jury could find that the defendants took affirmative action with the likely effect of suggesting to the owners of the pump house or others that persons primarily concerned with the safety of the eight-inch pipe were taking care of it.  The jury could find that care of a neglected and overlooked pipe was assumed by the defendants' predecessor in title when its officer placed a padlock on the door of the pump house and that the defendants, by their acts when

[4] Deeds in evidence showed as follows: Exhibit 5 November 14, 1938, *Pacific Mills* to *Samuel Toabe*.  The passageway and other land but reserving and excluding the pump house and pipes under the passageway; also reserving the right to use the passageway.  Exhibit 6.  June 3, 1957, *Pacific Mills* to *Twindustries, Inc.*  A portion of Canal Street and all interest in the pump house and right of passageway reserved in the Toabe deed "and in and to any pipes . . . pumps, hydrants and other facilities" variously located including "on or under" the property granted to the defendants' predecessors in title on December 6, 1938, and to Toabe on November 14, 1939, "and all rights of the grantor to go upon said properties and to repair, maintain and use, or remove, said pipes . . . and other facilities.  Said pipes . . . and other facilities are now conveyed, however, subject to the grantor's obligations with respect thereto and with respect to the repair, maintenance, use and removal thereof."  Exhibit 7.  December 10, 1957, *Twindustries, Inc.* to *city of Lawrence*.  The property rights and duties acquired by the grantor in exhibit 6.  This deed, delivered to the city Treasurer, was not recorded; the city council did not vote to accept it; no consideration was paid.  A contemporaneous deed from Twindustries of other buildings was recorded and the consideration was paid.

[5] As to the need, and hence the implication, of a right to receive water through the eight-inch pipe, see *Gorton-Pew Fisheries Co.* v. *Tolman*, 210 Mass. 402, 410–411; *Dale* v. *Bedal*, 305 Mass. 102, 103–104; *Dubinsky* v. *Cama*, 261 Mass. 47, 56–57.  See also G. L. c. 183, § 15.  As to the right to protect the supply when it was threatened by neglect of the pump house owners, see *Hodges* v. *Raymond*, 9 Mass. 316; *Colburn* v. *Richards*, 13 Mass. 420; *Hayes* v. *Di Vito*, 141 Mass. 233, 237–238; *Peters* v. *St. Aubin*, ante, 41, 45.

they became owners, also assumed the care of the facility. The jury could find that the defendants thus came under a duty to those who might otherwise be hurt to exercise due care. See *Frizzell* v. *Metropolitan Coal Co.* 298 Mass. 189, 191; *Reil* v. *Lowell Gas Co.* 353 Mass. 120, 126–130. In the *Frizzell* case we said that "liability for damage caused by the condition of premises commonly depends upon control of the offending instrumentality, either through ownership or otherwise." In the *Reil* case, we held that the "power and duty to exercise dominion" were enough apart from ownership.

2. The jury could find that the defendants were negligent. Between 1959 and 1963 Ferris did not go into the pump house to see if the heater was working. For a number of days prior to March 7, 1963, temperatures in Lawrence had been below freezing. There was then no heat in the pump house. The records of the utility company showed that the meter recording the amount of electricity used in the pump house indicated that no electricity was used from January 15, 1963, to March 7, 1963. The door to the pump house was found without the padlock and open after the freezing and breaking of the eight-inch pipe. Ferris testified that he knew heat was required to keep the eight-inch pipe from freezing; he ordered the heater because children were breaking the windows.

3. The cases against the defendants and the city of Lawrence were tried and submitted to the jury with cases against Rowland. If either the city or Rowland was liable it was because of the legal obligations of an owner. See fn. 4.

The judge charged the jury to determine who was in control of the eight-inch pipe and to do this "without going into the question of ownership or title." He charged further that a person in control is under a duty to exercise reasonable care and instructed that the jury must determine whether there was a failure in this duty by the person they found to be in control. "Determine who has control of this so-called offending instrumentality. . . . [C]ontrol alone

in this case will determine your verdict. It is the person who is in control who has the duty." There followed full instructions to guide the jury in finding a breach of duty and the standard of care.

As there was no evidence of control in fact by Rowland or the city, this charge left the jury with no basis for a finding against either.[6] We are not concerned with whether the instructions were unduly favorable to Rowland or the city [7] but only with the effect of what was said and not said on the defendants' rights.

It was inescapable that only the defendants could be found to be in control in fact and that there was evidence of some acts of control by them. In these circumstances careful instructions were required to guide the determination of whether what the defendants did by way of control was enough to impose the duty of care. Otherwise, the jury, asked to determine who among Rowland, the city and the defendants was in control, were almost inevitably going to find that the defendants were in control.

The defendants' requests before and after the charge were adequate to call the judge's attention to the need for instructions. The defendants in a long request that undertook to summarize the evidence as to what the defendants did in the pump house, and also in a shorter request that referred to the padlock, the enclosing of the pipe, and the installation of the strip heater asked the judge to instruct that the acts referred to put the defendants under no duty "to the plaintiff[s] to furnish heat or to take any action . . . to prevent the freezing . . . of the . . . pipe." Another

---

[6] For that matter, the auditor's report, in findings or rulings which the defendants did not attack, either by motions to strike or by requests for rulings, completely exonerated both Rowland and the city. A general finding (really a ruling) read: "Neither the defendant Rowland . . . nor the defendant municipality was under any obligation or duty of maintenance, repair or responsibility for protection against freezing with respect to the 8-inch manifold pipe on the date of the bursting and flooding." The auditor also found that there was no evidence of negligence by Rowland or the city.

[7] The duty of an owner of the fee or of a possessory interest in the land depends upon the concomitant right to control. *Frizzell* v. *Metropolitan Coal Co.* 298 Mass. 189, 191, and cases cited. That one under a duty to take care of property fails to exercise any control in fact does not lessen the duty. On the contrary, it tends to show a breach of the duty.

request asked the judge to instruct that if the defendants did not own the pump house or the eight-inch pipe and if they had no control of it arising out of possession or a right to possession by reason of a tenancy, letting or license or easement granted them by the owner, then they "did not have control of the pump house or 8-inch pipe and were under no duty to the plaintiff[s] to do anything to protect the 8-inch pipe."

These requests, although they should not have been given (see point 1 above), directed attention to the issue whether and in what circumstances persons not owning an interest in the pipe, but acting in respect of it, might come under a duty to others. At the close of the charge the defendants requested the court "to instruct the jury further as to the manner by which a person can acquire control of an instrumentality other than by ownership by reason of which he would have the affirmative duty to do something to safeguard that instrumentality from causing harm." The court declined to do this and the defendants saved an exception.

The defendants were entitled to instructions that the jury should determine whether the defendants had taken charge of the pipe as an owner would and had so acted as to suggest to all concerned that the pipe was being looked after or whether, alternatively, what the defendants did showed no more than limited action to protect the flow of water into their sprinkler system without stepping into the shoes of the owner and taking charge of the pipe and pump house.

The required instructions were not given. The illustration that a person who painted and repaired a derelict sloop or another who maintained a garden in it could be found in control, but the owner of the land on which the sloop had come to rest, who did nothing about it, could not, did not meet the need.

4. It was not error to decline, on defendants' motion before trial began, to strike the auditor's finding that the defendants' control was exclusive; the exception to the denial of the motion is overruled. The finding in context could be understood to refer to the circumstance that no one other

than the defendants exercised any control. If requested, instructions should have been given, in connection with those otherwise called for as discussed in point 3, that the finding was not to be construed as a finding that the defendants' acts in fact excluded an owner having legal control.

5. For the reasons stated in point 3 the entry must be

*Exceptions sustained.*